IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: WELLBUTRIN XL          :          CIVIL ACTION
ANTITRUST LITIGATION          :
                              :
                              :
                              :          NO. 08-2433 (indirect)

MEMORANDUM

McLaughlin, J.                                    July 30, 2009

     The plaintiffs are a group of indirect purchasers of
Wellbutrin XL, a once-a-day antidepressant, who are suing the
producers of Wellbutrin XL, Biovail Corp., Biovail Laboratories,
Biovail Laboratories International (together, "Biovail"), and its
distributors, SmithKline Beecham Corp. and GlaxoSmithKline PLC
(together, "GSK"), for illegally conspiring to prevent generic
versions of Wellbutrin XL, or buproprion hydrochloride, from
entering the American market for that drug.

     Plumbers and Pipefitters Local 572 Health and Welfare
Fund ("Local 572"), IBEW-NECA Local 505 Health and Welfare Plan
("Local 505"), Painters District Council No. 30 Health and
Welfare Fund ("D&C 30"), Mechanical Contractors-United
Association Local 119 Health and Welfare Plan ("Local 119"), and
Bricklayers and Masons Union Local Union No. 5 Ohio Health and
Welfare Fund (Local Union No. 5) are trust funds acting as
"employee welfare benefit plans" and "employee benefit plans."
These plaintiffs bring suit on the basis of their reimbursement
of their members' purchases of Wellbutrin XL.

The plaintiffs themselves are located in Alabama, Illinois, Tennessee and Ohio.  The plaintiffs allege to have members whom they reimbursed for purchases of Wellbutrin XL residing in Alabama, California, Florida, Illinois, Indiana, Nevada, New Jersey, New York, Ohio, Pennsylvania, Tennessee, Texas and Wisconsin.  The plaintiffs seek to represent an "end payor" class comprised of other purchasers of Wellbutrin XL throughout the country.

The plaintiffs' amended complaint includes three counts, each alleging violations of several separate state laws. The first count alleges a violation of state antitrust laws on the basis of alleged monopolization of the American market for buproprion hydrochloride.[1]  The second count alleges violations of certain states' consumer protection laws.[2]  The third count is

---

[1] With respect to this first count, the plaintiffs invoke the laws of the District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.  Am. Compl, ¶¶ 196-228.

[2] The relevant states for this count are Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Louisiana, Maine, Maryland, Massachuset, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Washington and West Virginia, as well as the District of Columbia.  Am. Compl, ¶¶ 229-272.

a claim for unjust enrichment that references the law of no particular jurisdiction.

Biovail and GSK submitted separate motions to dismiss the amended complaint.[3]  First, the defendants argue that the plaintiffs fail to allege an injury that would provide for standing under the majority of the state laws on which the plaintiffs rely.  The defendants contend that the plaintiffs have standing to sue only under the laws of the states where the plaintiffs themselves are located.  Second, the defendants argue that the plaintiffs have failed to state claims under the statutes of the various states referenced in counts one and two.  Third, the defendants attack the plaintiffs' claim of unjust enrichment in count three.  With respect to count three, Biovail argues that the failure to refer to the law of any particular jurisdiction is fatal to the plaintiffs' effort to state a claim.  GSK echos the Biovail argument and also argues that count three is an impermissible repackaging of the claims in counts one and

---

[3]The defendants filed motions to dismiss the plaintiffs' original complaint on September 10, 2008.  The Court held oral argument on those motions on February 26, 2009, at which time the issue of the named plaintiffs' standing to assert claims under the statutes of the various states referenced in the original complaint was a central point of contention.  The plaintiffs filed an amended complaint on March 26, 2009, mooting those motions to dismiss.  The amended complaint is substantially identical to the original complaint except that it alleges that the plaintiffs have members who purchased Wellbutrin XL in more states than were stated in the original complaint.

two and that the plaintiffs' unjust enrichment claim is barred under the laws of the plaintiffs' home states.

The plaintiffs argue first that they have standing under Article III of the Constitution to assert claims under each statute referenced in the amended complaint.  Opp'n at 13.  They assert that they have been injured, that the defendants caused the injury and that their injury will be redressed by a judgment in their favor.  They argue that this general assertion is sufficient for a threshold showing of Article III standing.

Next, the plaintiffs argue that, if a standing determination must be made with respect to each state referenced in the amended complaint, and if such a determination is ripe for decision, then they have standing to assert claims under the laws of those states where they are located and where their members made purchases of Wellbutrin XL.  Opp'n at 15-18.  However, the plaintiffs also argue that it would be premature for the Court to make a determination as to their ability to bring suit under the laws of those states where neither they nor their members reside. They argue that such a determination is appropriately handled in the class certification context.

Finally, presuming that they have standing to bring each claim, the plaintiffs argue that should survive a motion under Rule 12(b)(6) for failure to state a claim.  The plaintiffs argue that they have adequately stated claims under the laws of

4

the states referenced in counts one and two, as well as in their unjust enrichment claim in count three.

The Court holds that it must make a determination of the plaintiffs' standing to assert each claim of the amended complaint at this stage of the litigation.  The plaintiffs' argument that they have general Article III standing is insufficient to establish standing with respect to particular claims.  The Court finds that the plaintiffs have standing to assert claims only under the laws of those states where the plaintiffs are located or their members reside.  The Court will dismiss those claims arising under all other states.

The remaining claims arise under the laws of California, Florida, Illinois, Ohio, Nevada, New York, Tennessee, and Wisconsin.  The Court will grant the defendants' motions to dismiss parts of counts one and two for failure to state a claim. The Court will dismiss claims arising under the antitrust law of Florida, and claims arising under the consumer protection laws of Illinois, Nevada, New York and Ohio.  The plaintiffs have conceded their claims under the laws of Pennsylvania and Texas. Opp'n at 47 n.31.

Finally, because the plaintiffs' third count for unjust enrichment refers to no law or jurisdiction, the Court will dismiss the plaintiffs' claims under that count.

5

I.   Legal Background

        Certain provisions of federal law relating to the
procedures for approving new drugs are at the center of the
plaintiffs' allegations.  The plaintiffs claim that Biovail and
GSK abused provisions of the Food, Drug and Cosmetic Act, 21
U.S.C. §§ 301-392 ("FDCA"), for the purpose of delaying the
marketing of generic versions of their drug Wellbutrin XL.

        The FDCA provides two different sets of procedures for
the approval of new drugs.  First, the manufacturer of a new drug
must obtain approval from the Food and Drug Administration
("FDA") by filing a New Drug Application ("NDA").  This
application contains data as to safety and effectiveness.  In
filing an NDA, manufacturers also list any patents that the
manufacturer believes could reasonably be asserted against a
generic manufacturer who makes, uses, or sells a generic version
of the drug prior to the expiration of the listed patents.  These
patents are listed in the FDA's book of Approved Drug Products
with Therapeutic Equivalence Evaluations (known as the "Orange
Book").  The amended complaint states that the FDA does not
exercise tight supervision over the contents of the Orange Book,
relying on manufacturers to list patents in good faith.  Am.
Compl., ¶ 33.

        The second approval procedure was established in 1984
by the Hatch-Waxman Amendments. Pub. L. No. 98-417, 98 Stat. 1585

(1984).  The purpose of the Amendments was to speed the approval of generic versions of brand-name drugs while respecting brand manufacturers' patent rights.  Generic manufacturers need not file NDAs.  Instead, they may file Amended New Drug Applications ("ANDA").  ANDAs require a showing of safety and effectiveness and a showing of bioequivalency to an approved brand-name drug. Bioequivalency refers to equivalency of the active ingredient, dosage, route of administration and strength between a brand-name and generic drug.  Am. Compl., ¶ 29.

As part of an ANDA, generic manufacturers must certify that they will not infringe any brand manufacturers' patents. One method of certification is referred to as a "Paragraph 4" certification, which requires the generic manufacturer to state that a potentially conflicting Orange Book patent is either invalid or will not be infringed by the proposed generic.

The Hatch-Waxman Amendments seek to protect brand manufacturers' patents.  In the case of an ANDA including a Paragraph 4 certification, brand manufacturers have 45 days from the date of notice of the ANDA's filing to initiate litigation on any potentially infringed patents.  If the brand manufacturer brings suit within that 45 day window, then the FDA may not give final approval to the generic drug for the shorter of 30 months or a finding by the court that the patent is invalid or not infringed.

The plaintiffs also base their amended complaint on a separate provision of the FDCA.  Section 505(j) of the FDCA allows for a person (including a corporation) to file a "Citizen Petition" requesting that the agency take or refrain from taking any administrative action, which may include the approval of a generic drug.  The FDA must respond to these petitions within 180 days of their filing.  The plaintiffs allege that, until a 2007 amendment to the FDCA, it was common practice for the FDA to withhold ANDA approval until after consideration of a Citizen Petition.  Am. Compl., ¶ 47.

II.  Allegations of the Plaintiffs' Amended Complaint

The plaintiffs allege that GSK and Biovail have acted in concert to abuse the provisions of the Hatch-Waxman Amendments by filing meritless litigation in an effort to delay the entry of generic competitors into the American market for Wellbutrin XL.  They also allege that Biovail filed a baseless citizen petition with the FDA in a further attempt to delay the generics' market entry.

The amended complaint makes the following assertions.  Biovail and Pharma Pass, LLC, collaborated to create an extended release formula for buproprion hydrochloride in the 1990s.  Id., ¶ 66.  Pharma Pass's chemists created an extended release version of the drug using off-the-shelf chemical compounds unworthy of

8

patent protection in themselves.  However, they were able to acquire a patent on their formula by claiming that it was "free of stabilizer of any kind."  "Stabilizer" is the term used for a chemical or compound that prolongs the release of a drug after initial administration.  This formula received patent No. 6,096,341 (the "341 patent").  Id., ¶¶ 70-71.  A continuation of the 341 patent was issued on November 7, 2000.  This patent number was 6,143,327 (the "327 patent").  Id., ¶ 84.  Biovail acquired Pharma Pass in December of 2002 and later obtained the rights conferred by the 341 and 327 patents.  Id., ¶ 85.

On October 26, 2001, Biovail and GSK entered into a contract to promote and distribute Wellbutrin XL in the United States and Canada.  Id., ¶ 87.  In August of 2002, GSK filed a New Drug Application ("NDA") with the FDA.  GSK listed the 341 and 327 patents in the FDA's Orange Book as patents that could reasonably be asserted to cover Wellbutrin XL.  Id., ¶ 88.  The FDA issued approval of Wellbutrin XL to GSK on August 8, 2003. Id., ¶ 89  On December 31, 2004, the 341 and 327 patents were formally assigned to Biovail.  Id., ¶ 92.

On September 21, 2004, Anchen (a generic manufacturer of bupropion hydrochloride) filed an ANDA seeking FDA approval to market Wellbutrin XL's generic alternative in a 150mg and 300mg formulation.  Anchen's ANDA included a Paragraph 4 certification that stated that it would not infringe the 341 or 327 patents.

The basis for this assertion was the presence of "stabilizer" compounds in the Anchen generic version.  Id., ¶ 98.  On September 23, 2004, Abrika, another generic manufacturer, filed a similar ANDA, as did the manufacturer Impax on November 30, 2004. Id., ¶¶ 102, 105.  On July 21, 2005, the manufacturer Watson filed a similar ANDA for the 300mg formulation of bupropion hydrochloride. Id., ¶ 108.

The amended complaint alleges that on December 21, 2004, GSK and Biovail co-filed an action against Anchen alleging infringement of the 341 and 327 patents in the Central District of California.  The same claims were made by GSK and Biovail against Abrika in the Southern District of Florida.  In both cases, the claims based on the 327 patent were eventually withdrawn.  Id., ¶ 138.  On March 7, 2005, Biovail filed an action against Impax alleging a violation of the 341 patent. Id., ¶ 113.  Biovail later filed suit against generic manufacturer Watson.  Id., ¶ 139.

The plaintiffs allege that all of the generic competitors provided the defendants with access to their ANDAs and sample products to allow them to compare the products to Wellbutrin XL and its applicable patents.  Id., ¶ 116.  They allege that these ANDAs and sample products demonstrated conclusively that the generic formulations did not infringe

Wellbutrin XL's patents because of the presence of a stabilizer in the generics. Id., ¶ 115.

Anchen received FDA tentative approval for its generic version of Wellbutrin XL on November 14, 2005, but was unable to manufacture and market its product because of the ongoing patent infringement litigation. A generic version of Wellbutrin XL, therefore, was allegedly ready for market entry on November 14, 2005. Id., ¶ 140.

On December 20, 2005, Biovail filed a citizen petition with the FDA allegedly for the sole purpose of blocking the generics' entry to market. Id., ¶ 141. The plaintiffs claim that the FDA had a practice of delaying approval of generic drugs until the resolution of a citizen petition. Id., ¶ 154. On December 14, 2006, the FDA denied Biovail's citizen petition and, on the same day, granted final approval to Anchen's and Abrika's ANDAs. Id., ¶ 151.

On December 15, 2006, the FDA gave Impax tentative approval for its 150 mg formula and final approval of its 300 mg formula. On June 13, 2007, the FDA gave Watson final approval for its 300 mg formula. Id., ¶¶ 152-53. Biovail settled its litigation with Anchen and Impax before either matter had gone to summary judgment. The plaintiffs claim this highlights the sham nature of the suits. Id., ¶ 157-58. These settlements barred

generic competitors from releasing their 150 mg formulas until
2008. Id., ¶ 160.

The plaintiffs' amended complaint states that they seek
to represent a class of end payors defined as:

> All persons or entities in the United States and its
> territories who, at any time during the period November
> 14, 2005, to the entry of judgment in this action . . .
> , paid or reimbursed for or will pay or reimburse for
> Wellbutrin XL and AB-rated generic equivalents in any
> form.  For purposes of the End Payor Class definition,
> persons and entities paid or reimbursed for Wellbutrin
> XL and AB-rated generic equivalents if they paid or
> reimbursed for some or all of the purchase price.

Am. Compl., ¶ 185.


III. Analysis

The threshold question the Court must answer is whether
the Court should consider the named plaintiffs' standing to bring
the claims asserted under each individual state's law or should
wait until the class certification stage to make such an
assessment.  The Court concludes that it must decide the
plaintiffs' standing to bring each claim now.  The Court
concludes that the plaintiff benefit funds may bring claims under
the laws of the states in which they are located and in which
their members, for whom they have reimbursed purchases of
Wellbutrin XL, reside.  The named plaintiffs' claims under other
state laws will be dismissed.  The Court will then consider

whether the amended complaint states a claim under the various state laws for which the named plaintiffs have standing to sue.

    A.    Timing of the Standing Analysis

         Article III of the Constitution requires that a plaintiff have standing to assert his claims.

> Constitutional standing requires: (1) an injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Winer Family Trust v. Queen, 503 F.3d 319, 325 (3d Cir. 2007).

         A plaintiff's standing to sue must be analyzed on the basis of each claim asserted.  "The complaining party must . . . show that he is within the class of persons who will be concretely affected.  Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." Blum v. Yaretsky, 457 U.S. 991, 999 (1982).

         Standing is analyzed on a claim by claim basis.  Each element of standing (injury, causation, redressability) must relate to each other in relation to the claim asserted.  "Typically, . . . the standing inquiry requires careful judicial

13

examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen v. Wright, 468 U.S. 737, 752 (1984). Standing "should be seen as a question of substantive law, answerable by reference to the statutory and constitutional provision whose protection is invoked." Int'l Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 77 (1991) (quoting William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 229 (1988)).

In addition to the "immutable requirements of Article III," the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. These principles are:

(1) the Plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties;

(2) even when the Plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and

(3) the Plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 221 (3d Cir. 2004) (quoting Trump Hotels & Casino Resorts, Inc. v. Mirage

Resorts Inc., 140 F.3d 478, 484 (3d Cir. 1998) (internal citations omitted)).

Ordinarily, standing is a threshold issue for any case, including class actions.  "[A] plaintiff . . . must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." Warth v. Seldin, 422 U.S. 490, 501 (1975).  The requirement of a named plaintiff's standing is no different in the class action context. Lewis v. Casey, 518 U.S. 343, 357 (1996).  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Id. (internal quotations omitted).  "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." O'Shea v. Littleton, 414 U.S. 488, 494 (1974).  "The initial inquiry . . . is whether the lead plaintiff individually has standing, not whether or not other class members have standing." Winer Family Trust, 503 F.3d at 326.

Standing in the context of class actions remains a claim by claim prerequisite.  "[E]ach claim must be analyzed

15

separately, and a claim cannot be asserted on behalf of a class unless at least one plaintiff has suffered the injury that gives rise to that claim."  Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987).  A named plaintiff whose injuries have no causal relation to, or cannot be redressed by, the legal basis for a claim does not have standing to assert that claim.  For example, a plaintiff whose injuries have no causal relation to Pennsylvania, or for whom the laws of Pennsylvania cannot provide redress, has no standing to assert a claim under Pennsylvania law, although it may have standing under the law of another state.

The defendants have asserted that the plaintiffs are unable to bring claims under the laws of states where the named plaintiffs are not located because the named plaintiffs lack standing to do so.  The plaintiffs rely on a recent decision of the United States Supreme Court, and several lower court opinions applying that decision, to argue that the Court should defer an examination of the named-plaintiffs' ability to represent unnamed plaintiffs with claims under the laws of states in which the named plaintiffs are not located or have members until the class certification stage of litigation.  Opp'n at 18.[4]

_____

[4]The plaintiffs argue that waiting to decide whether they may represent proposed class members from states where the plaintiffs themselves allege no relevant injury would not be a deferral of an Article III standing analysis.  Indeed, the plaintiffs recognize that Article III standing is a prerequisite

The plaintiffs rely on <u>Ortiz v. Fibreboard Corporation</u>, 527 U.S. 815 (1999), for the proposition that class certification must come before an examination of the named plaintiffs' ability to assert the claims of unnamed parties to a class action.  <u>Ortiz</u> involved a global settlement of claims against a manufacturer of asbestos-containing products.  The issue before the Court in <u>Ortiz</u> was the propriety of the district court's certification of a class consisting of

> all persons with personal injury claims against Fibreboard [the manufacturer] for asbestos exposure who had not yet brought suit or settled their claims before the previous August 27; those who had dismissed such a claim but retained the right to bring a future action against Fibreboard; and "past, present and future spouses, parents, children, and other relatives" of class members exposed to Fibreboard asbestos.

<u>Id.</u> at 826-27 (internal quotations omitted).

Before reaching the issue of the certification's propriety under Rule 23, the Supreme Court addressed the

---

to their suit, but argue that an injury providing standing under the law of <u>some</u> state is enough to provide for standing to bring a claims on behalf of proposed class members from <u>all</u> states. The plaintiffs argue that once they have established an injury, causation and redressability, in connection to some state law claim, a court need only to determine whether they are adequate representatives of the proposed class under Rule 23.  However, because a standing analysis requires a plaintiff to establish standing on a claim by claim basis, the threshold question of standing is not satisfied by an assertion of standing on less than all claims.  In attempting to defer the consideration of the plaintiffs' "ability to represent" proposed class members from states where the plaintiffs themselves allege no injury, the plaintiffs' argue, in essence, that an Article III standing analysis is premature.

petitioners' argument that the class claims were nonjusticiable under Article III of the Constitution for lack of standing.  The petitioners argued that "this is a feigned action initiated by Fibreboard to control its future asbestos tort liability, with the 'vast majority' of the 'exposure-only' class members being without injury in fact and hence without standing to sue."  Id. at 831.  Notably, the petitioners attacked the standing of the absent class members and not the standing of the named plaintiffs.

In that context, the Supreme Court followed its decision in Amchem Products, Inc. V. Windsor, 521 U.S. 591 (1997), and deferred consideration of Article III standing of the proposed class members until after the consideration of class certification because the latter was "logically antecedent" to the former.  Ortiz, 527 U.S. at 831 (citing Amchem, 521 U.S. at 612).  Thus, in a case involving a global settlement in which certain members of a proposed class may not have standing to sue and where the Court was presented with a request for class certification and standing issues simultaneously, the Supreme Court addressed dispositive certification issues prior to issues of Article III standing.  Had the Court found that certification of the proposed class was improper, the issue of certain class members' standing would have been moot.  To rule on the issue of standing at that point in the case would have required the Court

to make a determination as to the standing of persons who were
not actually parties to the case, but who were only proposed
parties to the case.

Amchem, on which Ortiz relied, also involved a global
settlement of an asbestos class-action involving claims on behalf
of a proposed class of people exposed to asbestos and certain of
their "spouses, parents, children, and other relatives." Amchem,
521 U.S. 591, 603 n.5 (1997).  As in Ortiz, the petitioners in
Amchem challenged the standing of exposure-only class members
prior to the certification of the class.  The Supreme Court
affirmed the Court of Appeals for the Third Circuit by stating
that "because [the resolution of class certification issues] is
logically antecedent to the existence of any Article III issues,
it is appropriate to reach them first."  Amchem, 521 U.S. at 612.

As in Ortiz, Amchem dealt with the standing of absent
class members, not the named plaintiffs.  Also as in Ortiz, a
ruling in Amchem as to the standing of people who were not
asserting claims against the defendants (the proposed class
members) would have been illogical.  Had the proposed class
members become actual class members, then an inquiry into their
standing to assert claims would become the next logical course of
action.

Neither Amchem nor Ortiz discussed the standing of the
named plaintiffs.  Neither case discussed or cited to Warth,

19

Lewis, or O'Shea.  Given the context of those cases and that they limit their consideration of proposed class members' standing to cases where class certification is "logically antecedent" to Article III issues, the Court believes it is unlikely that they were intended to overturn silently the holdings of long standing precedent.

This case does not present an issue that is "logically antecedent" to a standing inquiry.  The standing issue in Ortiz and Amchem related to proposed class members, i.e., persons who were not yet parties to the case.  It would be illogical to find that a non-party lacks standing to pursue a claim precisely because they are not pursuing a claim.  Thus, the question of whether the proposed class members could become parties to the case was logically antecedent to the question of whether they had standing to make claims against the defendants in those cases.  In this case, however, the Court reviews the standing of actual, not proposed, plaintiffs.

Ortiz and Amchem exist most naturally as examples of the pragmatic commitment "not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  Scott v. Harris, 550 U.S. 372, at 388 (Breyer, J., concurring) (quoting Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)), see also, Northwest Austin Mun. Util. Dist. No. One v. Holder, 129 S. Ct. 2504 (2009) (quoting Escambia County v.

20

McMillan, 466 U.S. 48, 51 (1984) (per curiam) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.")); Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of").

The plaintiffs argue that this reading of Ortiz and Amchem, threatens to negate the "logically antecedent" language of those opinions.  They argue that if those cases are taken as examples of the avoidance of constitutional adjudication, then "district courts would never decide standing issues first, since they are constitutional in nature."  Opp'n at 20.

The plaintiffs overstate the implications of the Court's reading of Ortiz and Amchem.  Courts utilize the advice of cases like Ashwander when two issues, one constitutional and one non-constitutional, are "properly presented by the record" at the same time.  297 U.S. 288, 347.  Courts do not wait for potentially dispositive issues to arise at later stages of litigation solely in an effort to postpone and avoid constitutional adjudication.  Where a case presents a constitutional issue and a dispositive, non-constitutional issue

21

simultaneously, Courts may avoid unnecessary constitutional rulings by deciding the dispositive non-constitutional issue.

As the defendants point out, several decisions of the lower courts, including those of the United States Courts of Appeals for the Fifth and Ninth Circuits, have recognized the limited holding of Ortiz.  Easter v. Am. West Fin., 381 F.3d 948, 962 (9th Cir. 2004); Ford v. NYLCare Health Plans of Gulf Coast, Inc., 301 F.3d 329, 333 n.2 (5th Cir. 2002); Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315, 319 n.6 (5th Cir. 2002); In re Salomon Smith Barney Mut. Fund Fees Litigation, 441 F.Supp. 2d 579, 606 (S.D.N.Y. 2006); In re Eaton Vance Corp. Securities Litigation, 220 F.R.D. 162, 166-70 (D. Mass. 2004).

The plaintiffs argue, however, that the cases cited by the defendants are not binding on this Court and that they stand only for the proposition that a plaintiff that has suffered no injury at all lacks standing.  That, however, is precisely the problem that the named plaintiffs face in this case.  The defendants assert that the plaintiffs have no injuries, and therefore no standing, in connection to the majority of states referenced in the amended complaint.

The plaintiffs argue that other courts have applied the Ortiz decision more broadly so as to postpone an analysis of named plaintiffs' standing to assert claims under the laws of states in which they personally have no standing.  See, Payton v.

22

County of Kane, 308 F.3d 673, 680 (7th Cir. 2002); Clark v. McDonald's Corp., 213 F.R.D. 198, 205 (D.N.J. 2003); In re Hypodermic Products Antitrust Litigation, No. 06-cv-0174, 2007 WL 1959225 (D.N.J. Jun. 29, 2007); In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004); and Sheet Metal Workers National Health Fund v. Amgen, Inc., No. 07-05295-MAS, 2008 U.S. Dist. LEXIS 62181, at *28-29 (D.N.J. Aug. 12, 2008).[5]

In the midst of this circuit split and the divergence of opinion among district courts as to the application of Ortiz, no court explicitly states that Warth or Lewis has been overturned with respect to named plaintiffs' standing requirements.  Those earlier precedents, combined with the constricting language of Ortiz and Amchem and the unique posture

---

[5]The plaintiffs also cite to several district court cases from outside of the Third Circuit.  Opp'n at 21-23.  They cite to In re Chocolate Confectionary Antitrust Litigation, MDL No. 1935, 602 F. Supp. 2d 538, 579 (M.D. Pa. 2009); In re Hypodermic Prods. Antitrust Litigation, MDL No. 1730, 2007 U.S. Dist LEXIS 47438, at *56-58 (D.N.J. June 29, 2007); and In re Actimmune Marketing Litigation, Master File No. C 08-02376-MHP, 2009 U.S. Dist. LEXIS 36133, at *44 (N.D. Cal. Apr. 28, 2009), which adopted readings of Ortiz consistent with that in Clark.  One case plaintiffs cite stated in dicta that "in these circumstances [comparable to those in this case], it is appropriate to decide class certification before resolving alleged Article III challenges of the present kind," but went on to say that the issue was premature in that the parties had not briefed the question of which state laws applied to the present claims.  In re Buspirone Patent Litigation, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002).  Again, the Court declines to follow the Buspirone decision:  the issue of the named plaintiffs standing to assert a particular claim listed in the complaint does not depend on choice of law or on class certification.

of those global settlement cases, demonstrate that a standing analysis should not be deferred in this case.  Every circuit to address the question has agreed that a named plaintiff must have individual standing to pursue a class action claim, including the Payton Court.  A ruling as to the named plaintiffs' standing depends in no way upon the standing of proposed class members.  Thus, the named plaintiffs' standing is not "logically antecedent" to the issue of class certification.  By its terms, the Ortiz method of avoiding the adjudication of constitutional questions does not apply to this case.

The alternative proposed by the plaintiffs would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.  At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share.  That would present the precise problem that the limitations of standing seek to avoid.  The Court will not indulge in the prolonged and expensive implications of the plaintiffs' position only to be faced with the same problem months down the road.

24

B.    Standing Analysis

        The parties dispute the plaintiffs' standing to assert

claims under the various state statutes referenced in the amended

complaint.  The defendants argue that the facts alleged are

sufficient only to demonstrate standing in the states where the

benefit funds are located.  The plaintiffs argue that they have

standing in the states where they are located and the states

where their members purchased Wellbutrin XL and that, on that

basis, they may assert the claims of proposed class members from

each state referenced in the amended complaint.

        The United States Court of Appeals for the Third

Circuit has summarized the holding of Bell Atlantic Corporation

v. Twombly, 127 S. Ct. 1955 (2007), which states the applicable

pleading standard in the face of a motion to dismiss:

> The Supreme Court's Twombly formulation of the pleading
> standard can be summed up thus: "stating ... a claim
> requires a complaint with enough factual matter (taken
> as true) to suggest" the required element.  This "does
> not impose a probability requirement at the pleading
> stage," but instead "simply calls for enough facts to
> raise a reasonable expectation that discovery will
> reveal evidence of" the necessary element.

Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)

(citing Twombly, 127 S.Ct. at 1965).

        The Court must now determine whether the plaintiffs

have alleged facts sufficient to raise a reasonable expectation

that discovery will reveal evidence of standing to assert each of

their claims.  The Court will first determine whether the

plaintiffs have standing to assert claims in the states where their members purchased Wellbutrin XL.  The Court will then address the question of the plaintiffs' standing to assert claims on behalf of proposed class members from states where the plaintiffs are neither located nor have members residing.

1.   The Plaintiffs Have Standing to Bring Claims under the Laws of States Where Their Members Reside

The plaintiffs assert claims on the basis of injuries derived from reimbursing purchases made by their members.  They argue that the price of Wellbutrin XL was inflated due to illegal and anticompetitive business tactics.  The amended complaint states that each plaintiff "during the class period . . . reimbursed for bupropion hydrochloride extended release purchases by its members residing in [various states], and was injured as a result of Defendants' misconduct."  Am. Compl., ¶¶ 14-18.

The defendants have argued that the plaintiffs may not assert standing in states where their members made purchases of Wellbutrin XL.  They argue that the plaintiffs have standing based only on reimbursements made by the named plaintiffs themselves, and that such an injury takes place only in the states where the named plaintiffs reside.  The defendants contend that to hold otherwise would permit the named plaintiffs to assert standing on the basis of injuries to their members and not to the named plaintiffs themselves.

26

The plaintiffs' allegation of injury, however, does not rely on injury to their members.  The injury is alleged to have impacted the plaintiffs themselves through the act of reimbursing their members.  See Opp'n at 15.  Reimbursement for the purchase of drugs, the price of which is allegedly inflated through anticompetitive or otherwise illegal means, constitutes a monetary injury to the plaintiffs.

Having determined that the plaintiffs have alleged an injury to the plaintiffs themselves, the Court must determine whether the plaintiffs have alleged facts sufficient to demonstrate that such an injury "fairly can be traced to the challenged action," and "is likely to be redressed by a favorable decision."  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

The named plaintiffs have identified an injury in fact that is fairly traceable to conduct taking place in states where their members purchased Wellbutrin XL.  Those injuries would be redressed by a favorable determination under the laws of the states where their members purchased Wellbutrin XL.  The elements of a standing analysis of the plaintiffs' claims have clear connection to the states where the plaintiffs themselves are located and the states where their members made purchases of Wellbutrin XL.  Therefore, plaintiffs' have standing to assert claims in those states.

2.   <u>The Plaintiffs Lack Standing in All Other States</u>

The Court must now determine whether the plaintiffs have standing to bring claims under the laws of states where no named plaintiff is located and where no member of a named plaintiff purchased Wellbutrin XL.

The allegations of injury are described above.  These allegations present no facts that would connect injuries specific to the plaintiffs, as opposed to injuries against competitors and purchasers nationwide, to any cause arising in states where no named plaintiff is located and where no member of a named plaintiff purchased Wellbutrin XL.  The amended complaint, therefore, provides no facts on which to find a connection between an alleged injury and some wrongful conduct that would implicate the laws of those states in which no plaintiff, or any of their reimbursed members, resides.

Despite this lack of facts demonstrating injury, causation and redressability, the plaintiffs argue that they may properly assert claims of proposed class members who were injured in those states regardless of their own standing to assert the same claims.  This is essentially a recasting of the argument that the Court need not make a determination of the parties' standing at this stage of the litigation.

The plaintiffs discuss several cases in support of the idea that named plaintiffs with standing in one state may

28

represent absent plaintiffs from states in which the named plaintiff does not have standing.  The first is In re Wellbutrin SR Direct Purchaser Litigation, No. 04-5525, 2008 U.S. Dist. LEXIS 36719 (E.D. Pa. May 2, 2008).  This case involved a direct purchaser class suing under the provisions of the Sherman Act, a federal law for which citizens of any state would have standing to sue regardless of the state in which they suffered the relevant injury.

The plaintiffs offer a string of citations to cases that certified multistate classes without a class representative from each state.  Opp'n at 30 n. 19.  Of these cases, two come from the United States Court of Appeals for the Third Circuit. The first is In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998).  In re Prudential involved a class action with state law claims from all fifty states asserted by lead plaintiffs from less than all fifty states.  See In re Prudential Ins. Co. Am. Sales Practice Litig., 962 F. Supp. 450 (D.N.J. 1997). Prudential insurance had been accused of fraudulently selling certain insurance policies.  A class action was initiated by several plaintiffs from different states.  A settlement agreement was reached between the plaintiffs and Prudential covering a class of people who had held Prudential policies over a certain period of time.

29

The only challenge to standing in <u>Prudential</u> was based on the fact that certain class members had not actually been injured.  This was true due to the definition of the class, which encompassed all policy holders over a period of time and not only those who were defrauded (the settlement agreement created an arbitration process by which all class members, injured or not, could assert any claims they may have had against Prudential).  Neither the district court nor the Court of Appeals reached the issue of Article III standing as applied to claims arising under particular states' laws and, therefore, this Court will not rely on that case as a basis of support for the plaintiffs' position.[6]

The second case cited by the plaintiffs from the U.S. Court of Appeals for the Third Circuit is <u>In re School Asbestos Litigation</u>.  789 F.2d. 996 (3d Cir. 1986).  This case permitted the certification of a class consisting of schools across the nation and led by named plaintiffs from Pennsylvania.  The case involved tort claims sounding in negligence based on violations of federal asbestos regulations.  Again, the Court did not discuss Article III standing in this opinion.[7]

---

[6]"[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect." <u>Lewis v. Casey</u>, 518 U.S. 343, 352 n.2 (1996).

[7]The plaintiffs also cite the following cases as examples of courts allowing named plaintiffs to lead a class on the assertion of state laws for which they would not personally have standing to assert the same claim: <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 252 F.R.D. 83 (D. Mass. 2008) ("In a multi-state

The Court holds that the plaintiffs fail to allege that they have standing to bring claims in the majority of the jurisdictions referenced in the amended complaint.  However, the amended complaint does set forth facts that demonstrate the plaintiffs' standing to bring claims in those states in which they are located and in which they have members to whom they paid reimbursements.  Therefore, the Court will proceed to analyze the defendants' motions to dismiss the plaintiffs' claims for failure to state a claim under the laws of California, Florida, Illinois,

---

class, the case law does not create a per se rule that the Court must appoint a separate representative for each state or even each group."); In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. 229, 230-31 (D. Mass. 2006); In re Relafen Antitrust Litig., 221 F.R.D. 260, 266-70 (D.Mass.2004); Mowbray v. Waste Mgmt. Holdings, Inc., 189 F.R.D. 194, 195 (D. Mass. 1999); In re Synthroid Mktg. Litig., 188 F.R.D. 295, 302 (N.D. Ill. 1999) (certifying a class like that proposed in this case, but noting that standing issues ultimately may require decertification of the state law counts.).  None of these cases explicitly deals with Article III standing requirements.

Finally, the plaintiffs cite In re Abbott Labs. Norvir Antitrust Litig., Nos. C 04-1551, C 04-4203, 2007 WL 1689899, at *5, *8-*10 (N.D. Cal. Jun. 11, 2007).  This case allowed a class of plaintiffs to proceed with claims under California law after holding that one of the named plaintiffs had standing to bring such a claim.  Id. at *5.  In that case, the named plaintiff with standing to bring the claim under California law was in fact a resident of California who was injured in his personal payments for prescription drugs.  Id. at *4.  The Norvir case, therefore, is support for the requirement of presenting at least one named plaintiff with standing to make a given claim.  To the extent the plaintiffs rely on that portion of Norvir that permitted the named plaintiffs to proceed on a claim of unjust enrichment untied to any particular state, the Court rejects their argument for the reasons provided in this section and for the reasons provided below in Part III(C)(9).

Nevada, New York, Ohio, Pennsylvania, Tennessee, Texas and
Wisconsin.

Because plaintiff Local 119 is located in Alabama,
alleges to have members residing only in Alabama, and because the
plaintiffs bring no claims under the laws of Alabama, plaintiff
Local 119 will be dismissed from this case for lack of standing
to bring any of the surviving claims.


C.   The Plaintiffs' Remaining Claims

The following claims remain for the Court's analysis:
antitrust and consumer protection claims under California law;
antitrust and consumer protection claims under Florida law; a
consumer protection claim under Illinois law; antitrust and
consumer protection claims under Nevada law; a consumer
protection claim under New York law; a deceptive trade practices
claim under Ohio law; an antitrust claim under Tennessee law; an
antitrust claim under Wisconsin law; and the plaintiffs' unjust
enrichment claim.  The plaintiffs have conceded their claims
arising under the laws of Pennsylvania and Texas.

The Court will grant the defendants' motions to dismiss
the plaintiffs' claims arising under the antitrust law of
Florida.  The Court will grant Biovail's motion to dismiss all
antitrust claims against it to the extent that they rely on a
theory of substantive monopolization.  Antitrust claims against

32

Biovail will proceed only to the extent they rely on a theory of conspiracy or concerted action.

The Court will also grant the defendants' motions with respect to claims arising under the consumer protection laws of Illinois, Nevada, New York and Ohio.  Because Local Union No. 5 is located in Ohio, alleges to have members residing only in Ohio, and because the plaintiffs' claim under Ohio law has been dismissed for failure to state a claim, plaintiff Local Union No. 5 is also dismissed from this case for lack of standing to bring any of the surviving claims.

Finally, the Court will also grant the defendants' motions to dismiss the plaintiffs' claim of unjust enrichment.

1.   The Plaintiff's California Antitrust and Consumer Protection Claims

The plaintiffs allege that the defendants have violated both the California Antitrust Law, Cal. Bus. & Prof. Code § 16700, et seq. ("Cartwright Act"), and the state's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. The Court will deny the motions with respect to both claims.

The Cartwright Act contains language that explicitly permits suits by indirect purchasers.  In relevant part, the statute prohibits any "agree[ment] to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity,

33

that its price might in any manner be affected." Cal. Bus. &
Prof. Code § 16720(e)(4). The statute permits a suit by "any
person who is injured in his or her business or property by
reason of anything forbidden or declared unlawful by this
chapter, regardless of whether such injured person dealt directly
or indirectly with the defendant." Id., § 16750(a).

GSK does not challenge the amended complaint's
statement of a claim against it under the Cartwright Act.
Biovail, however, argues that the amended complaint contains no
allegations that would suggest that Biovail itself monopolized
any market within the United States or any particular state. The
amended complaint alleges that the "relevant [product] market is
all [Wellbutrin XL]" and that the "relevant geographic market is
the United States and its territories." Am. Compl., ¶¶ 173-4.
However, the amended complaint does not allege that Biovail
itself ever sold Wellbutrin XL to anyone in the relevant market,
i.e., the market for retail sales of Wellbutrin XL in the United
States. The Biovail defendants manufactured and distributed
Wellbutrin XL; neither action could constitute a monopolization
of the relevant market. Biovail may be liable, if at all, only
under a theory of concerted action or conspiracy to monopolize
the relevant market.

The Court holds that the amended complaint sufficiently
alleges facts that would support a claim under this theory of

liability.  Specifically, the allegations that GSK and Biovail jointly filed the first two allegedly sham actions against their generic competitors, and Biovail's filing of the allegedly sham FDA citizen complaint, serve to establish a basis for a theory of conspiracy to monopolize or concerted action in restraint of trade.  Because California's Cartwright Act permits suits based on such theories, the Court will permit the plaintiffs' claims to continue only under such a theory.  The Court will place this same limitation on the plaintiffs' surviving antitrust claims under the laws of Nevada, Tennessee and Wisconsin.

The California Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice. . . ." Cal. Bus. & Prof. Code § 17200.  The defendants challenge the plaintiffs' claims arising under the California UCL on three grounds.  First, the defendants argue that the UCL prohibits suits by indirect purchasers.  Biovail Br. at 27-28; GSK Br., Ex. D at 12.  GSK cites to Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937 (Cal. 2003), in support of this assertion.  The California Supreme Court discussed the available remedies in an action under the UCL in Korea Supply, stating that "an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."  Id. at 947.

In its dismissal of the plaintiff's claim in that case, the court in Korea Supply discussed the plaintiff's allegations relating to restitution.  The plaintiff in Korea Supply was "not seeking the return of money or property that was once in its possession," and therefore the Court denied recovery under a theory of restitution.  Id.

The discussion of directness in Korea Supply did not concern whether a plaintiff had sold a product directly to a defendant, as the defendants in this case argue.  Instead, "directness" in this discussion concerns only the requirements for a recovery in the form of restitution, as opposed to more general compensatory damages.  The defendants point to no authority that would otherwise bar a suit under the UCL by indirect purchasers, and the Court will, therefore, deny their motions to dismiss this claim on this basis.

Second, Biovail argues that the plaintiffs' claims under the UCL must fail for the lack of factual allegations concerning the traceability of funds earned through prohibited practices.  Biovail Br. at 27 n.15.  The Court holds that the amended complaint adequately alleges that overcharges for Wellbutrin XL can be traced to each defendant.  If the plaintiffs are successful on the substance of their claims, then they may benefit from a restitutionary remedy in which overcharges are paid back to those plaintiffs.

36

Third and finally, Biovail challenges the plaintiffs'
California UCL claim by arguing that the plaintiffs have failed
to adequately allege reliance on the part of indirect purchasers.
Biovail Br. at 40.  Biovail argues that the actions alleged
constitute an action under the "fraud prong" of the UCL.  Under
that prong, a plaintiff must plead reliance on a false statement
made by the defendants.  In re Tobacco II Cases, 2009 Cal. LEXIS
4365, at *55 (Cal. May 18, 2009).  Tobacco II stated that the UCL
"imposes an actual reliance requirement on plaintiffs prosecuting
a private enforcement action under the UCL's fraud prong."

The plaintiffs rebut this argument by stating that
their claims are not limited to fraud, but span all three prongs
of the UCL.  The UCL allows causes of action for "unlawful,
unfair, or fraudulent" behavior.  California courts have
emphasized the disjunctive language of this statute.  See People
ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal. App. 4th
508, 515 (Cal. App. 2d Dist. 2002) ("Written in the disjunctive,
the language of Bus. & Prof. Code, § 17200, establishes three
varieties of unfair competition.").  Indeed, Tobacco II limited
its discussion of actual reliance to the UCL's "fraud prong."

The plaintiffs note that the Supreme Court of
California held that § 17200 "embraces anything that can properly
be called a business practice and that at the same time is
forbidden by law."  Korea Supply, 63 P.3d at 943.  A claim to

37

redress an unlawful business practice "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]." Farmers Ins. Exchange v. Superior Court, 826 P.2d 730 (Cal. 1992) (permitting a UCL to proceed by reference to the McBride-Grunsky Insurance Regulatory Act of 1947, California Insurance Code, §§ 1851-1861.16).

The allegations of the amended complaint contain facts alleging business practices "forbidden by law," specifically the institution of sham litigation and the misuse of the FDA's citizen petition procedures.  These allegations, if proven, would constitute violations of California antitrust law, which may stand as the basis of a claim under the "unlawful" or "unfair" prongs of the UCL if such conduct caused the plaintiffs' injuries.  In re Ditropan XL Antitrust Litig., 529 F.Supp.2d 1098, 1105 (N.D. Cal. 2007).  Therefore, the Court holds that the plaintiffs have alleged violations of the "unfair" and "unlawful" prongs of the California UCL.

2.   The Plaintiffs' Florida Antitrust and Consumer
     Protection Claims

The amended complaint includes a claim of monopolization and a claim of unfair competition or unfair or deceptive acts practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.

("FDUTPA").   The amended complaint does not reference the Florida Antitrust Act, Fla. Stat. §§ 542.15 et seq.   The plaintiffs' brief in opposition to the motions to dismiss, however, does rely in part on that statute.   Opp'n at 64.   The Court will grant the defendants' motion to dismiss the plaintiffs' claims to the extent they rely on the Florida Antitrust Act; it will deny the defendants' motion with respect to the FDUTPA.

The Florida Antitrust Act reads, in relevant parts: "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful;" and "[i]t is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state."   Fla. Stat. §§ 542.18-542.19.

The Florida courts have interpreted the Florida Antitrust statute to prohibit suits brought by indirect purchasers consistently with the federal antitrust policy enunciated in Illinois Brick Co. v. Illinois, 431 U.S. 720, 728-729 (1977).   Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 110 (Fla. Dist. Ct. App. 1996).   To the extent that the plaintiffs advance claims under the Florida Antitrust Act, those claims will be dismissed.

The FDUTPA states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or

39

deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1). Despite the Florida courts' interpretation of the state's antitrust law as prohibiting indirect purchaser actions, indirect purchaser plaintiffs may still pursue claims under the FDUTPA. Mack, 673 So. 2d 100, 110.

The defendants challenge the plaintiffs' right to bring a claim under the FDUTPA on two grounds: 1) that the FDUTPA precludes claims by out-of-state consumers; and 2) that the amended complaint fails to allege significant contacts with Florida.

The defendants argue that the FDUTPA precludes actions brought by out-of-state consumers. GSK also argues that Florida's consumer protection law requires allegations of actions either occurring primarily in-state or mainly affecting intrastate commerce with merely incidental effect on interstate commerce. GSK Br. at 30. The defendants argue also that under the FDUTPA, courts may only certify a class of Florida businesses. GSK Br. at 33; Biovail Br. at 34.

The defendants cite for support of their position to Océ Printing Sys. v. Mailers Data Servs., Inc., 760 So. 2d 1037 (Fla. Dist. Ct. App. 2000). Océ Printing was a case involving a proposed class of end-payors complaining of unfair trade practices in the servicing, sale and maintenance of ultra-high

40

speed printers.  760 So. 2d 1037.  The District Court of Appeals reversed a trial court order certifying the end-payor class with respect to claims arising under the FDUTPA.  The District Court of Appeals stated that the FDUTPA was enacted to protect in-state consumers, and that the trial court's order certifying a nationwide class was contrary to "express statutory language." 760 So. 2d at 1042.  See also, Coastal Physician Services of Broward County v. Ortiz, 764 So.2d 7 (Fla. Dist. Ct. App. 1999).

The plaintiffs cite to more recent cases, also from the Florida District Courts of Appeal, which adopt a reading of the FDUTPA that is opposed to that in Océ Printing.  The first is another case from the District Court of Appeal for Florida's Fourth District, Renaissance Cruises, Inc. v. Glassman, 738 So.2d 436 (Fla. Dist. Ct. App. 1999), which upheld a class certification that applied the FDUTPA to a class of consumers that included non-Florida residents.  Id.

The Florida District Court of Appeal for Florida's Third District followed Renaissance Cruises in rejecting a claim that the FDUTPA permits only Florida residents to sue under its terms.  Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, 761 So. 2d 1256 (Fla. Dist. Ct. App. 2000).  Millennium Communications observed, in contrast to the Océ Printing court, that the FDUTPA contains no language limiting its protections to in-state consumers  Id., 761 So. 2d at 1261.

41

In each of the cases limiting the application of the FDUTPA, the courts' concern was the certification of a nationwide class of consumers under Florida law.  At this stage of litigation, this case does not present the same issue.  The plaintiffs are not seeking to apply Florida law to out-of-state plaintiffs, but only to those plaintiffs whose injuries arose in Florida.  Opp'n at 50.  Although in Océ Printing the court stated that only in-state consumers could pursue a claim under FDUTPA, that holding came in the context of an appeal from the certification of a nationwide class action under Florida law. Océ Printing, moreover, recognized that the FDUTPA, unlike the Florida Antitrust Act, contains no language limiting its application to in-state activity.  The Court holds that the FDUTPA does not prevent claims by out-of-state plaintiffs.

Biovail also argues that the FDUTPA only applies to those plaintiffs asserting "significant contact" with Florida. Biovail cites to Hutson v. Rexall Sundown, Inc., 837 So. 2d 1090, 1094 (Fla. Dist. Ct. App. 2003), for this proposition.  Hutson, however, found that the plaintiff class had failed to allege sufficient contact with Florida to support a nationwide class action under the FDUTPA.  In that case, out of state contacts predominated with respect to the entire proposed class.  The plaintiffs' do not seek to apply Florida law to a nationwide class, nor does the complaint fail to state sufficient contacts

42

with respect to that portion of the proposed class seeking relief under Florida law.

The Court holds that the FDUTPA may apply to the named plaintiffs' claims as they relate to the reimbursement of purchases of Wellbutrin XL in Florida.  The FDUTPA contains no language that would deny relief to either non-Florida residents, or limit its reach to only in-state plaintiffs or Florida businesses.  The defendants provide no authority that would counsel in favor of reading such restrictions into the FDUTPA or dismissing this claim at the present stage of litigation.  Unlike the defendants' challenge to the named plaintiffs' standing, the issue of the application of Florida law to a portion of the proposed class is a question better suited for consideration in conjunction with class certification.  At this stage of the case, the amended complaint alleges that certain of the named plaintiffs were injured in part through reimbursements for purchases of overpriced drugs sold in the state of Florida.  This suffices to state a claim under the FDUTPA.

3.   <u>The Plaintiffs' Illinois Consumer Protection Claim</u>

The plaintiffs' amended complaint includes a claim of unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA").  815 Ill. Comp. Stat. Ann. 505/1, <u>et</u>

seq. (2009).  The Court holds that the plaintiffs may not assert
what are essentially antitrust claims in the guise of a claim
under the Illinois consumer protection statute.  The Court,
therefore, will dismiss the plaintiffs' claims under the CFDBPA.

In relevant part, the CFDBPA states that "[u]nfair
methods of competition and unfair or deceptive acts or practices,
. . . in the conduct of any trade or commerce are hereby declared
unlawful whether any person has in fact been misled, deceived or
damaged thereby.  815 Ill. Comp. Stat. Ann. § 505/12.

The defendants cite Laughlin v. Evanston Hospital, 550
N.E.2d 986, 993 (Ill. 1990), a decision of the Supreme Court of
Illinois, which stated that "[t]o construe the Consumer Fraud Act
to give a cause of action for discriminatory pricing that the
legislature refused to give under the Antitrust Act would be
incongruous [with the intent of the legislature]."  In Laughlin,
the plaintiffs brought a case for non-predatory discriminatory
pricing under both the Illinois antitrust statute and the CFDBPA.
The court held first that non-predatory price discrimination did
not state a claim under the Illinois Antitrust statute.  The
court then held that to allow the same claim to proceed under the
CFDBPA would be inconsistent with the legislature's intent to
limit the reach of its antitrust law.  See also, Gaebler v. New
Mexico Potash Corporation, 676 N.E.2d 228 (Ill. App. Ct. 1996)

(dismissing an indirect purchaser class action on the basis of circumvention of state antitrust laws).

The plaintiffs cite to Siegel v. Shell Oil Co. in support of their claim that not all cases that sound in antitrust are necessarily barred by the holding of Laughlin.  480 F. Supp. 2d 1034, 1046-48 (N.D. Ill. 2007).  Siegel, however, addressed the question of "whether consumers can elect to pursue a remedy under the Consumer Fraud Act where the Illinois Antitrust Act may also provide relief."  Id. at 1048 (emphasis in original).

The complaint in this case is a "classic example" of an antitrust claim.  Gaebler at 230.  The allegations of consumer fraud overlap entirely with the allegations of anticompetitive conduct.  The parties do not dispute that the Illinois Antitrust Act would preclude relief for these plaintiffs as class representatives of indirect purchasers.  The Court, therefore, will dismiss the plaintiffs' claim arising under the Illinois consumer protection.

    4.   The Plaintiffs' Nevada Antitrust and Consumer Protection Claims

The plaintiffs allege violations of both the Nevada antitrust statute, Nev. Rev. Stat. Ann. §§ 598A.010-598A.280 (2009),[8] and the Nevada Deceptive Trade Practices Act, Nev. Rev.

_____

[8] Sections 598A.010-598A.280, which prohibit monopolization and restraints of trade, are collectively titled the "Nevada

Stat. Ann. §§ 598.0903-598.0999 (2009).  The Court will deny the defendants' motions to dismiss the plaintiffs' claim under the Nevada antitrust statute; it will grant their motions to dismiss the claim arising under Nevada's Deceptive Trade Practices Act.

The Nevada antitrust statute provides a list of prohibited activity:

1.   Every activity enumerated in this subsection constitutes a contract, combination or conspiracy in restraint of trade, and it is unlawful to conduct any part of any such activity in this State: . . .

(e)   Monopolization of trade or commerce in this State, including, without limitation, attempting to monopolize or otherwise combining or conspiring to monopolize trade or commerce in this State.

Nev. Rev. Stat. § 598A.060.

The defendants challenge the plaintiffs' Nevada antitrust claim on the ground that Nevada law requires some allegation of in-state conduct on the part of the defendants. Neither defendant cites any authority other than the language of the statute itself in support of this argument.

The language of the Nevada antitrust statute covers a broad range of activity.  It prohibits conducting "any part" of a prohibited activity in the state.  Although the allegations of the amended complaint do not suggest that the commencement of the

Unfair Trade Practice Act."  In order to avoid confusion between this claim and the claim arising under Deceptive Trade Practices Act, the Court will refer to the former statute as the "Nevada antitrust statute."

defendants' allegedly sham litigation or the filing of the allegedly unfounded FDA citizen petition took place in Nevada, they do allege that the defendants undertook these acts in order to maintain monopoly power within Nevada and the rest of the United States.  The allegedly illegal maintenance of a nationwide monopoly constituted a part of safeguarding monopoly power and monopolistic pricing of Wellbutrin XL in Nevada.

The Court has found only one Nevada state court case construing the scope of the Nevada antitrust statute.  In <u>Pooler v. R.J. Reynolds Tobacco Co.</u>, No. CV00-02674, 2001 WL 403167 (Dist. Ct. Nev., Washoe Ct. Apr. 4, 2001), the Second Judicial District Court for the State of Nevada, Washoe County, analyzed allegation of a price-fixing conspiracy between cigarette manufacturers, distributors and retailers.  The allegations of that case described a price-fixing agreement, wholesale and retail marketing, incentive programs and retail sales to end-payors, all of which were integral to the nature, implementation of a conspiracy to maintain monopoly power within Nevada.  <u>Id.</u> at *2.

As in <u>Pooler</u>, the retail sales of Wellbutrin XL are integral to the success of the defendants' allegedly anticompetitive conduct and constitute a basis for a claim under the Nevada antitrust statute.  <u>See</u> <u>In re Intel Corp. Microprocessor Antitrust Litigation</u>, 496 F.Supp.2d 404 (D. Del.

47

2007) (holding that the sales of illegally priced microprocessors in Nevada constituted "a part" of a conspiracy to restrain competition in that state).  The Court, therefore, will deny the defendants' motion to dismiss the plaintiffs' Nevada antitrust claim.  The Court, however, will limit the plaintiffs' antitrust claim against Biovail to a theory asserting conspiracy or concerted action.

The defendants also challenge the plaintiffs' claim of a violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903-598.0999 (2009).  The defendants argue that the Nevada Deceptive Trade Practices Act grants a cause of action only to elderly or disabled persons.  The defendants are correct.  The only provision of this Act providing for a private civil action is limited to suits by "an elderly person or a person with a disability."  Id. § 598.0977.  The plaintiffs assert that certain members of their proposed class may fit this description, but this possibility is irrelevant given the named plaintiffs' own lack of standing to assert this claim.[9]

---

[9]The plaintiffs attempt to resuscitate their Deceptive Trade Practices Act by requesting that they be permitted to amend their complaint to assert claims under a different provision of Nevada law.  The Court denies the plaintiffs' request for leave to amend.  The plaintiffs have already had one prior opportunity to amend their complaint so as to state the correct grounds for their claims and the Court will not permit amendment of the plaintiffs' case on an rolling basis.

5.   <u>The Plaintiffs' New York Consumer Protection Claim</u>

The plaintiffs assert that the defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York's General Business Law.  N.Y. Gen. Bus. Law § 349, <u>et</u> <u>seq</u> (McKinney 2004).  The Court will grant the defendants' motions and dismiss this claim.

The relevant provision of the New York General Business Law states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  <u>Id.</u> § 349(a). "[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages . . . ."  <u>Id.</u> § 349(h).

The New York Court of Appeals has noted that the scope of the statute is broad and applies to virtually all economic activity.  To state a claim, a plaintiff must allege both a deceptive act or practice directed toward consumers and that such act or practice resulted in actual injury to a plaintiff.  <u>Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,</u> 818 N.E. 2d 1140, 1143 (N.Y. 2004).

Biovail argues that a "third-party payor" has no standing to bring an action under General Business Law § 349 because its claims are too remote from any allegedly illegal

49

acts.  The New York Court of Appeals has stated that indirect injuries are not cognizable under the state's consumer protection law.  In Blue Cross, the New York Court of Appeals found that neither the text nor the history of the consumer protection statute suggested that the legislature intended to allow insurers to bring their own, direct actions based on injuries to their insureds.  Id. at 1144.  The Court of Appeals held that a third party payor's injuries were not cognizable under § 349 because its claims were too remote.  Id. at 1145.

The Court recognized the broad standing granted to plaintiffs under § 349, noting that non-consumers could sue for deceptive business practices.  Id. at 1144-5.  But the Court noted that, although non-consumers may have standing to sue under § 349, New York law still requires such plaintiffs to state a cognizable injury, of which indirect payments of medical costs were not one.

Blue Cross was affirmed in a recent opinion of the New York Court of Appeals.  In City of New York v. Smokes-Spirits.com, Inc., No. 92, 2009 WL 1585844 (N.Y. June 9, 2009), the Court addressed claims brought by the City of New York that the defendants' allegedly illegal marketing and shipment of cigarettes into New York had deprived the City of tax revenue. The plaintiff's alleged that the defendants had evaded state and federal law regulating excise taxes on cigarettes by selling

cigarettes on-line to consumers who were not informed that city and state taxes would be owed by a purchaser who possessed the cigarettes for use in New York.  Id. at *1.  The misrepresentation in that case was made to consumers of cigarettes.  The City claimed that by telling customers that they would not need to pay taxes on cigarette purchases, and by failing to file reports regarding sales to those consumers, the defendants deprived the City of tax revenue.  Id. at *2.

In analyzing the City's claim under § 349, the Court of Appeals affirmed Blue Cross in holding that the City's lost tax revenue was "entirely derivative of injuries that it alleges were suffered by misled consumers who purchased defendants' cigarettes over the Internet."  Id. at *3.  The Court held that the City's position was too remote from the alleged deception.  The Court stated that "had the allegedly deceived consumers not been improperly induced to purchase defendants' cigarettes then the City would have no claim to lost tax revenue."  Id.

In this case the plaintiffs are bringing their claims based on economic injuries to themselves.  The plaintiffs claim that the defendants originally deceived the FDA and the federal courts by filing sham litigation and a sham citizen petition. That is the only allegation of deceit in this case.  As a result of that alleged deceit, prices of Wellbutrin XL were maintained at supracompetitive levels.  The defendants' competitors, and

then direct purchasers, were the first entities to feel the effect of that deceit.  Finally, the plaintiffs were impacted when they reimbursed those individuals for their purchases.  The indirect purchaser plaintiffs' are too remote from the allegedly deceptive acts to state a claim for relief under New York law.

      6.   The Plaintiffs' Ohio Deceptive Trade Practices Claim

The plaintiffs bring one claim under the Ohio Deceptive Trade Practices Act.  Ohio Rev. Code Ann. § 4165.01, et seq.  The Court will dismiss this claim as an impermissible attempt to circumvent limitations on Ohio antitrust law.

The Ohio Deceptive Trade Practices Act states, in relevant part, that:

> (A)  A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following: . . .
>
>     (2)  Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . .
>
>     (7)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . .
>
>     (9)  Represents that goods or services are of a particular standard, quality, or grade, or

> > that goods are of a particular style or
> > model, if they are of another;
>
> (10) Disparages the goods, services, or business
>      of another by false representation of fact. .
>      . .

Ohio Rev. Code Ann. § 4165.02.

The Supreme Court of Ohio has ruled that allegations of monopolistic pricing practices brought by indirect purchasers do not state a claim under the Ohio antitrust law (the Valentine Act) and that the antitrust law provides the exclusive remedy for such alleged monopolistic pricing.  <u>Johnson v. Microsoft Corp.</u>, 834 N.E.2d 791, 801 (Ohio 2005). "[A] complaint that alleges a violation of the Ohio Consumer Sales Practices Act predicated upon monopolistic pricing practices does not state a claim upon which relief can be granted because the Valentine Act, not the CSPA, provides the exclusive remedy for engaging in such conduct."  <u>Id.</u>

The plaintiffs argue that <u>Johnson</u> does not control their claim, which arises under the Deceptive Trade Practices Act and not the Consumer Sales Practices Act.  The fact that the plaintiffs have amended their complaint to allege a violation of the Deceptive Trade Practices Act, rather than the Consumer Sales Practices Act, makes no difference in light of the ruling in <u>Johnson</u>.  The Valentine Act "provides the exclusive remedy" for claims of monopolistic pricing practices.  As noted in the Court's discussion of Illinois law, this complaint states a

53

classic example of an antitrust claim based on monopolistic pricing practices.  The plaintiffs' claim under the Ohio Deceptive Trade Practices Act is precluded by the Valentine Act and the ruling of the Supreme Court of Ohio.  The Court will dismiss the plaintiffs' claim arising under the Ohio Deceptive Trade Practices Act.

### 7.   The Plaintiffs' Tennessee Antitrust Claim

The plaintiffs assert that the defendants have violated the antitrust laws of Tennessee.  Tenn. Code. Ann. §§ 47-25-101, et seq.  The Court finds that the plaintiffs have alleged sufficient economic impact in Tennessee and will deny the defendants motion to dismiss this claim.

The Tennessee antitrust statute states that:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, . . . and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code. Ann. § 47-25-101.

The Supreme Court of Tennessee has concluded that, to state a claim under the antitrust law, a plaintiff must allege anticompetitive conduct which affects Tennessee trade or commerce

to a "substantial degree."  Freeman Industries, LLC v. Eastman
Chemical Co., 172 S.W.3d 512, 523 (Tenn. 2005).  Distinguishing
"conduct" from "effect," Freeman stated that "[t]he focus under
the substantial effects standard . . . is not on the
anticompetitive conduct itself but on the effects of the conduct
on Tennessee commerce."  Id. at 524.  "[T]he test is pragmatic,
turning upon the particular facts of the case . . . .  The
anticompetitive conduct, however, need not threaten the demise of
Tennessee businesses or affect market prices to substantially
affect intrastate commerce."  Id. at 523-24.

          Freeman dismissed an indirect purchaser's claims
against a business with its principal place of business in
Tennessee.  The plaintiff was a purchaser of products containing
sorbates, which were the alleged object of an anticompetitive
conspiracy.  The plaintiff did not allege that any sales of the
relevant product took place in Tennessee, but only that the
defendant, located in Tennessee, had orchestrated the conspiracy
from Tennessee.  Id.

          In this case, the plaintiffs allege that Local 572 has
an office located in Tennessee.  Am. Compl., ¶ 14.  They allege
that Local 572 reimbursed purchases by its members residing in
Tennessee.  Id.  They allege that the defendants sold substantial
amounts of Wellbutrin XL across state and national lines, that
these sales have substantially affected interstate commerce and

that members of the End Payor class paid for substantial amounts of Wellbutrin XL. Id., ¶¶ 161-164, 201.

The Court recognizes that the allegations of the amended complaint contain little information as to the specific impact of the defendants' alleged conduct with respect to any particular state.  However, the plaintiffs allege overcharges on a substantial amount of Wellbutrin XL across the United States, including Tennessee, and the Court will not dismiss the plaintiffs' Tennessee claims at this time for failure to allege the specific extent of any impact on the Tennessee economy.  The Court finds that the amended complaint contains facts that "raise a reasonable expectation that discovery will reveal evidence of" a substantial effect on the Tennessee economy sufficient to prove a claim under that state's antitrust law.  Twombly, 127 S.Ct. at 1965.  The Court will deny the defendants' motion to dismiss the plaintiffs' Tennessee antitrust claim, but will limit the plaintiffs' antitrust claim against Biovail to a theory asserting conspiracy or concerted action.

### 8.   The Plaintiffs' Wisconsin Antitrust Claim

The plaintiffs allege a violation of the Wisconsin antitrust law.  Wis. Stat. §§ 133.01-133.18 (2008).  The Court will deny the defendants' motion to dismiss this claim.

The relevant portions of the Wisconsin antitrust law read:

1.  Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. . . .

2.  Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce is guilty of a Class H felony. . . .

Id. § 133.03.

The provision of the antitrust law providing for a private cause of action reads:

a) Except as provided under paragraph (b), any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees.

Id. § 133.18.

GSK argues that the plaintiffs' claim under the Wisconsin law must be dismissed because the plaintiffs fail to allege that the defendants' conduct occurred in, or had a substantial impact in, Wisconsin.  The Supreme Court of Wisconsin requires anticompetitive conduct to substantially affect the people of that state.  Olstad v. Microsoft Corp., 700 N.W.2d 139, 158 (Wis. 2005).

Again, the Court recognizes that the amended complaint is short on specifics as to the exact impact of the defendants' actions within any particular state.  However, the Court finds

57

that the amended complaint contains facts that raise a reasonable
expectation that discovery will reveal evidence of a substantial
effect on the people of Wisconsin and impact in that state.  The
Court will deny the defendants' motion to dismiss the plaintiffs'
Wisconsin antitrust claim, but will limit the plaintiffs'
antitrust claim against Biovail to a theory asserting conspiracy
or concerted action.

### 9.   The Plaintiffs' Unjust Enrichment Claim

The final count of the plaintiffs' amended complaint is
a claim of unjust enrichment.  The amended complaint states that
the plaintiffs have unknowingly conferred an economic benefit
upon the defendants in the form of profits from overcharges on
Wellbutrin XL.  Am. Compl., ¶¶ 273-282.  The amended complaint,
however, does not reference any basis in law on which a claim for
unjust enrichment might proceed.  The plaintiffs fail to link
their claim to the law of any particular state.  As a result of
this deficiency, the plaintiffs fail to state a cause of action
under their third count.

Unjust enrichment is not a catch-all claim existing
within the narrow scope of federal common law.  See, Woodward
Governor Co. v. Curtiss Wright Flight Systems, Inc., 164 F.3d
123, 129-130 (2d Cir. 1999).  Nor does the assertion that the
elements of unjust enrichment claims are substantially identical

across all fifty states save the plaintiffs' claims.[10]  First, such an assertion seems unlikely to be true.  Ohio, for example, would disallow a claim for unjust enrichment in this case for the same reasons that it disallows the circumvention of its antitrust laws through a claim based on deceptive trade practices.

Second, cobbling together the elements of a claim of unjust enrichment from the laws of the fifty states is no different from applying federal common law.  For a time, the federal courts struggled to derive the kinds of "general laws" that the plaintiffs now propose,[11] but such is no longer the case.[12]  The Court will dismiss the plaintiffs' claim of unjust enrichment.

---

[10]The plaintiffs cite <u>Allegheny General Hospital v. Phillip Morris, Inc.</u>, 228 F.3d 429, 447 (3d Cir. 2000), as support for their characterization of the elements of a pan-jurisdictional unjust enrichment claim.  Opp'n at 79.  <u>Allegheny General Hospital</u>, however, focused on the application of the law of a single jurisdiction, Pennsylvania, and did not purport to apply a general rule of law common to every state.  <u>See</u>, <u>Id.</u>

[11] <u>See</u>, <u>e.g.</u>, <u>Swift v. Tyson</u>, 41 U.S. 1 (1842) ("The law respecting negotiable instruments may be truly declared in the languages of Cicero . . . to be in a great measure, not the law of a single country only, but of the commercial world.").

[12]<u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938) ("There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts.").

IV.  <u>Conclusion</u>

> For these reasons, the Court will grant the defendants' motions to dismiss for lack of standing the plaintiffs' claims arising under the laws of all states except those in which the plaintiffs are located or have members whose purchases of Wellbutrin XL the plaintiffs reimbursed.  The plaintiffs have conceded their claims arising under the laws of Pennsylvania and Texas and, therefore, those claims are also dismissed.  The Court will grant the defendants' motions to dismiss the plaintiffs' claims arising under the antitrust law of Florida for failure to state a claim.  The Court will also grant the defendants' motions with respect to claims arising under the consumer protection laws of Illinois, Nevada, New York and Ohio for failure to state a claim under those states' laws.

> Because plaintiff Local 119 is located in Alabama, alleges to have members residing only in Alabama, and because the plaintiffs bring no claims under the laws of Alabama, plaintiff Local 119 will be dismissed from this case for lack of standing to bring any of the surviving claims.  Because Local Union No. 5 is located in Ohio, alleges to have members residing only in Ohio, and because the plaintiffs' claim under Ohio law has been dismissed for failure to state a claim, plaintiff Local Union No.

5 is also dismissed from this case for lack of standing to bring any of the surviving claims.

An appropriate order will follow separately.