IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: WELLBUTRIN XL          :          CIVIL ACTION
ANTITRUST LITIGATION          :
                              :
                              :          NO. 08-2433 (Indirect)

MEMORANDUM

McLaughlin, J.                                    August 12, 2011

        The plaintiffs are a group of indirect purchasers of
Wellbutrin XL, a once-a-day antidepressant, who are suing the
producers of Wellbutrin XL (Biovail Corp., Biovail Laboratories,
and Biovail Laboratories International (together, "Biovail")),
and its distributors (SmithKline Beecham Corp. and
GlaxoSmithKline PLC (together, "GSK")), for illegally conspiring
to prevent generic versions of Wellbutrin XL from entering the
American market.  The plaintiffs seek to certify a class of end-
purchasers and third-party payors ("TPPs") under the antitrust
and/or consumer protection laws of six states.

        The defendants contend that the plaintiffs have failed
to meet several requirements for class certification under
Federal Rule of Civil Procedure 23.  The defendants' primary
argument against certification is that common issues do not
predominate over individual issues for antitrust impact and
damages.  The defendants argue that antitrust impact may not be
inferred for TPPs without individualized evidence.  The
defendants also argue that individual proof will be required for

measuring damages because different class members paid different amounts for Wellbutrin XL and its generic equivalents.  Class certification, the defendants argue, will also require a choice of law analysis to determine if named plaintiffs have claims under the six states at issue in this case.

The Court concludes that the plaintiffs have demonstrated that common issues will predominate and that the Rule 23 requirements for class certification have been met.  The Court, however, will exclude from the class definition entities that did not purchase generic extended-release buproprion hydrochloride in a class state after it became available.  The Court will therefore grant in part and deny in part the plaintiffs' motion.

I.   Background and Procedural History

This case is brought by several "employee welfare benefit plans" and "employee benefit plans"[1] and Aetna Health of California (collectively, "indirect purchaser plaintiffs" or "plaintiffs").  On March 26, 2009, the plaintiffs filed their first amended complaint seeking treble damages for the

---

[1]    These plans include Plumbers and Pipefitters Local 572 Health and Welfare Fund ("Local 572"), IBEW-NECA Local 505 Health and Welfare Plan ("Local 505"), Painters District Council No. 30 Health and Welfare Fund ("D&C 30"), Mechanical Contractors-United Association Local 119 Health and Welfare Plan ("Local 119"), and Bricklayers and Masons Union Local Union No. 5 Ohio Health and Welfare Fund ("Local Union No. 5")

defendants' alleged unlawful exclusion of generic versions of Wellbutrin XL through the filing of sham patent litigation.

On July 30, 2009, the Court granted in part and denied in part the defendants' motions to dismiss.  At the motion to dismiss stage, the Court concluded that it must address issues of standing prior to class certification.  See Wellbutrin XL, 260 F.R.D. 143, 151 (E.D. Pa. 2009).  The Court concluded that the named plaintiffs have standing "in those states where the named plaintiffs are located or their members reside or in which the named plaintiffs reimbursed purchases of Wellbutrin XL made by its members."  See Wellbutrin XL, 268 F.R.D. 539, 541 (E.D. Pa. 2010).

The Court's formulation of standing was intended to encompass the full scope of the plaintiffs' standing under Article III of the Constitution and prudential limitations.  See Wellbutrin XL, 260 F.R.D. at 152.  By the terms of the decision, the Court did not purport to address whether the named plaintiffs would have claims under choice-of-law principles.  See id. at 155 n.5 ("[T]he issue of . . . standing to assert a particular claim . . . does not depend on choice of law or on class certification.").

The Court subsequently denied Aetna Inc.'s motion to intervene on behalf of the entire proposed class, but allowed the subsidiary Aetna Health of California Inc. ("Aetna") to intervene

for California claims.  See In re Wellbutrin XL Antitrust Litig.,
268 F.R.D. 539, 547 (E.D. Pa. 2010) (denying Aetna, Inc.'s motion
to intervene on behalf of the entire proposed class); Sept. 21,
2010 Order (Docket No. 200) (granting Aetna Health of California
Inc.'s motion to substitute as a class representative for
California claims).

On December 22, 2010, the Court granted the plaintiffs
leave to amend their complaint to assert a claim under New York's
Donnelly Act in light of the Supreme Court decision, Shady Grove
Orthopedic Assocs., P.A. v. Allstate Ins. Co., 130 S. Ct. 1431
(2010).  See In re Wellbutrin XL Antitrust Litig., 756 F. Supp.
2d 670, 682 (E.D. Pa. 2010).  The plaintiffs submitted a second
amended complaint on January 7, 2011.

The plaintiffs' complaint alleges that the defendants
conducted a four-part scheme to delay the entry of generic
equivalents of Wellbutrin XL into the market, primarily by
misusing patent litigation.  Specifically, the plaintiffs allege
that the defendants (1) filed three sham patent litigations, (2)
filed a sham listing with the FDA's Approved Drug Products with
Therapeutic Equivalence Evaluation (the "Orange Book") (3) filed
a baseless FDA citizen petition and suit against the FDA, and
(4) formed agreements with potential generic competitors.  The
plaintiffs contend that the effect of these activities was to
delay the market entry of cheaper, generic alternatives to

Wellbutrin XL.  The plaintiffs contend that this scheme caused 300 mg generic extended-release bupropion hydrochloride to enter the market in December, 2006 instead of in November, 2005 and that the scheme prevented entry of 150 mg generic extended-release bupropion hydrochloride until May, 2008.

The plaintiffs have successfully pled antitrust claims arising under the laws of California, New York, Nevada, Tennessee and Wisconsin, and consumer protection claims arising under the laws of California and Florida.  See Wellbutrin XL, 260 F.R.D. at 168; Wellbutrin XL, 756 F. Supp. 2d at 682.[2]

The plaintiffs argue that class members have been injured by the defendants' alleged exclusionary conduct in two ways.  First, the plaintiffs argue that they overpaid for each purchase of generic extended-release bupropion hydrochloride. According to the plaintiffs' expert, prices for generic drugs decrease rapidly after they enter the market.  The plaintiffs argue that each actual generic purchase would have cost less if generics had entered the market earlier.  The Court will refer to this theory as the "generic overcharge theory."

---

[2]    The statutes are often referred to as "Illinois Brick-repealers."  In Illinois Brick, the Supreme Court prohibited federal antitrust suits by indirect purchasers.  Ill. Brick Co. v. Illinois, 431 U.S. 720, 728 (1977).  Following Illinois Brick, a number of states passed "Illinois Brick repealers," which established the right of an indirect purchaser to bring an antitrust claim under state law.  See Wellbutrin XL, 756 F. Supp. 2d at 676 n.1.

Second, the plaintiffs assert that TPPs were overcharged if they purchased Wellbutrin XL prior to generic entry. The TPPs theory of impact for purchases of branded Wellbutrin XL is that TPP class members paid an illegal overcharge when they purchased Wellbutrin XL because they would have substituted some branded purchases for cheaper generics, but for the alleged exclusionary conduct. The Court will refer to this theory as the "branded overcharge theory." Under this theory, the plaintiffs include both entities that purchased generic Wellbutrin XL and entities that did not purchase generic Wellbutrin XL after it became available.[3]

On September 30, 2010, the Honorable Lawrence F. Stengel denied class certification in a case that alleged unlawful delay of generic entry for another bupropion product, Wellbutrin SR. Judge Stengel expressed several concerns regarding whether antitrust impact could be proven with common evidence, particularly for individuals who would continue to purchase branded drugs after generic entry (so-called "brand loyalists") and individuals who paid the same co-pay for branded and generic drugs (so-called "flat co-payers"). See Wellbutrin

---

[3]    The plaintiffs have excluded individual purchasers from the "branded overcharge theory" to avoid problems with showing impact to individuals who continue to purchase branded Wellbutrin XL after generic entry or individuals who are subject to the same co-pay for either branded or generic drugs. See Wellbutrin SR, 2010 U.S. Dist. LEXIS 105646, at *85-87 (E.D. Pa. Sept. 30, 2010).

SR, 2010 U.S. Dist. LEXIS 105646, at *85-87 (E.D. Pa. Sept. 30, 2010).[4]

In response to the Wellbutrin SR class certification decision, on October 28, 2010, the indirect purchasers submitted an amended class definition in this case to address some of Judge Stengel's concerns.  See Docket No. 217.  The plaintiffs' revised class definition purported to exclude all end-payors that did not purchase generic XL (thereby eliminating so-called "brand loyalists") as well as "flat co-payers."  This revision, however, had the effect of excluding several named TPP plaintiffs that had not made generic extended-release bupropion hydrochloride purchases in class states.  On November 30, 2010, the plaintiffs then submitted a "corrected" revised class definition to reincorporate TPPs whether or not they had purchased generic extended-release bupropion hydrochloride.  See Docket No. 226. The current proposed class is:

> All persons or entities who purchased an AB-
> rated generic bioequivalent of Wellbutrin XL
> ("generic XL") at any time during the "Class
> Period" (hereafter defined) and all entities
> that purchased 150 mg or 300 mg Wellbutrin XL
> before an AB-rated generic bioequivalent was
> available for such dosages, and resided or
> had their place of business, or purchased the
> drug in California, Florida, Nevada, New

_____

[4]    The Court notes that it does not disagree with the Wellbutrin SR court's denial of class certification.  The plaintiffs in Wellbutrin SR failed to demonstrate that class-wide evidence was available to show antitrust impact for a substantial portion of the proposed class.

> York, Tennessee and Wisconsin.  For purposes
> of the Class definition, persons and entities
> purchased Wellbutrin XL or generic XL if they
> paid some or all of the retail purchase
> price.
>
> Excluded from the Class are "flat co-payers"
> meaning natural persons whose only purchases
> of generic XL were made pursuant to contracts
> with third party payers ("TPP") whereby the
> amount paid by the natural person for generic
> XL was the same regardless of the retail
> purchase price.
>
> The Class Period begins November 14, 2005 and
> ends on the earlier of the date of judgement
> or the date (to be determined) when the price
> of generic XL reached or reaches "steady
> state," i.e. the price was no longer higher
> than it would have been on that date but for
> the delayed availability of generic XL caused
> by Defendants' alleged illegal conduct.

Pls.' Second Am. Compl. ¶ 184 (Docket No. 249).  The plaintiffs'

counsel notified the Court that they intended the class period to

end on April 29, 2011.  <u>See</u> Notes of Testimony, Class

Certification Hr'g, April 29, 2011 ("N.T.") at 13 (Docket No.

317).

   The Court held a day-long evidentiary hearing on the

plaintiffs' motion for class certification on April 29, 2011.

The plaintiffs presented the testimony of Professor Meredith

Rosenthal and the defendants presented the testimony of Dr.

Andrew Joskow.[5]  On May 27, 2011, the Court held oral argument on

---

   [5]   Both experts are highly qualified.  Professor Meredith
Rosenthal has a Ph.D. in health policy from Harvard University
and she is Professor of Health Economics and Policy at the

the plaintiffs' motion.  The parties then submitted two rounds of supplemental briefing to address choice of law and other issues.

A related law suit has been filed by direct purchasers of Wellbutrin XL for violations of federal antitrust law.  The Court granted in part and denied in part the plaintiff's motion for class certification.  See In re Wellbutrin XL Antitrust Litigation, No. 08-2431 (direct) (Docket Nos. 368, 369).


II.  Choice of Law Analysis

After the Court's decisions on the motion to dismiss, Aetna's motion to intervene, and the addition of New York as a potential class state, there were six states under which the named plaintiffs potentially had claims.  These were states where the named plaintiffs either had their principal place of business or paid for purchases at pharmacies in the state.  Aetna had been explicitly allowed to intervene to represent California so California was the only state for which Aetna was, at that point,

---

Harvard School of Public Health.  Dr. Andrew Joskow has a Ph.D. in economics from Yale University.  He was the chief economist for the Antitrust Division of the Department of Justice.  He is now Senior Vice President at National Economic Research Associates, Inc.

a class representative.  The states and potential class
representatives were:

| State | Entity |
|-------|--------|
| Florida | Local 505 |
| Nevada | Painters No. 30 |
| New York | Local 505 |
| Wisconsin | Painters No. 30 |
| California | Aetna |
| Tennessee | Local 572 |

The defendants contend that at the class certification
stage, the Court must do a choice of law analysis to decide if
the named plaintiff designated to represent a certain state has a
claim under that state's law and can be a class representative.
The defendants argue that the law of the location of the named
plaintiff should govern with the result that the only two states
with class representatives who have principal places of business
in those states are California (Aetna) and Tennessee (Local 572).
The plaintiffs contend that the location of the pharmacy where
the prescriptions were filled should control and the law of that
state should govern.[6]  That would lead to six states with class

---

[6]     The parties have not argued that the law of the
location of the defendants' conduct (e.g., where the defendants
filed patent suits) should apply.  The parties have also not
addressed the location of individual consumers because no
individual consumers are named plaintiffs.  In considering the
law to apply to TPPs, however, the Court also considers the law
to apply to individual consumers.  For both groups, the Court
concludes that the law of the place of purchase applies.

representatives except that the designated class representatives
for Wisconsin and New York did not make any generic purchases in
that state and under the Court's analysis below, they do not have
a claim.  In that situation, the plaintiffs seek to have Aetna
represent not just California but also Wisconsin and New York
where Aetna has paid for purchases of generic drugs.

Although the parties do discuss this issue as choice of
law and, therefore, the Court will conduct such an analysis,
another way to frame the issue is whether an out-of-state
plaintiff would have a claim under the law of the particular
state under consideration.  To put it another way, could Aetna
state a claim under New York law for purchases it made in New
York even though it is a resident of California?

The Court, exercising diversity jurisdiction, must
apply the choice of law rules of Pennsylvania, the forum in which
it sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487,
496-97 (1941).  The first step in a choice of law analysis under
Pennsylvania law is to determine whether an actual or true
conflict exists between the laws of the competing states.  If no
conflict exists, further analysis is unnecessary.  If there is a
conflict, the court must conduct a choice of law analysis using
Pennsylvania choice of law principles.

In deciding whether there is a true conflict, the Court
must determine whether there is a conflict between the substance

of the laws of each respective potential forum.  Here, for TPPs, the potentially applicable laws that have been proposed are that of the TPP's home state, and the states in which it and its members purchased Wellbutrin XL.  Conflicts may exist between and among the laws of the relevant states for a given TPP.  For example, the home state of Local 505 (Alabama) does not recognize the plaintiffs' claims whereas the states in which Local 505 purchased Wellbutrin XL (New York and Florida) could provide a basis for recovery on these allegations.

In a putative class action in which the plaintiffs assert that a TPP should be able to bring claims under the laws of the location of purchase, and those claims are not cognizable under the laws of the TPP's home state, there will be actual conflicts between the antitrust and consumer protection laws of the relevant states.  The Court, therefore, finds that there is an actual or true conflict here and will apply Pennsylvania's choice of law principles to this matter.[7]

Pennsylvania applies a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem."  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227 (3d Cir. 2007) (quoting

---

[7]     When one considers Aetna, however, there may not be a true conflict because Aetna's home state of California does provide a potential basis for recovery.

Griffith v. United Air Lines, Inc., 203 A.2d 796, 805-06 (Pa. 1964)).  The Court must consider each state's contacts as set forth in the Restatement (Second) of Conflict of Laws as well as a qualitative appraisal of the relevant states' policies.  Id. at 231.

The Supreme Court has observed that "antitrust violations are essentially tortious acts . . . ."  Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 547 (1983) (quotations omitted).  For actions that sound in tort, the Restatement directs courts to consider the following contacts: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Rest. 2d Conflicts § 145(2).  See also Griffith, 203 A.2d at 802.  Section 158(2) of the Restatement notes that "[t]he applicable law will usually be the local law of the state where the injury occurred."  Rest. 2d Conflicts § 158(2).

The parties dispute where the alleged injury occurs for TPPs.  The plaintiffs argue that the injury occurs at the point of sale because the pharmacy is paid in part by the insurer, much like a credit card transaction.  The defendants counter that a TPP may have little or no direct connection with the place of

purchase because it may use an intermediate payment agent or pharmacy benefits manager ("PBM").  The defendants also argue that none of the alleged exclusionary conduct is alleged to have taken place in New York, Nevada, Florida, or Tennessee.

The home state of a TPP undeniably has a strong interest in transactions that affect the TPP.  The place of purchase likewise is a significant contact in this calculation. The place of purchase is where the relationship between the parties is centered; it is where the transaction with the alleged overcharge actually occurs.  A place-of-purchase rule protects justified expectations because an in-state transaction will be governed by the antitrust laws and/or consumer protection laws of that state and not by the chance location of the TPP's principal place of business, the location of the TPP's PBM, or an individual purchaser's residence.  This approach will also provide consistent results because all purchases within a state will be treated uniformly.

At oral argument, the Court discussed a hypothetical tourist visiting New York to see a Broadway Show who fills a prescription at a pharmacy in New York.  <u>See</u> Tr. at 34.  For that pharmaceutical purchase, as well as the tourist's purchase of theater tickets, rental of a hotel room, purchase of souvenirs, etc., that tourist is a consumer in New York.  The tourist's insurance company likewise is a consumer in New York when it

contributes to the payment for pharmaceuticals in New York. The
Court of Appeals of New York, for example, has recognized that
its consumer protection laws do not depend on the residency of
the parties but rather on the location of the transactions. See
Goshen v. Mut. Life Ins. Co., 98 N.Y.2d 314, 325 (2002) ("[O]ur
General Business Law analysis does not turn on the residency of
the parties. . . . [The intent of the statute] is to protect
consumers in their transactions that take place in New York
State. . . . [The statute was not] intended to function as a per
se bar to out-of-state plaintiffs' claims of deceptive acts
leading to transactions within the state.").

         The statutory language of the laws at issue here
contain no prohibitions that would indicate that a state has a
policy of only covering transactions that involve in-state
citizens, rather than in-state transactions. See Wellbutrin XL,
260 F.R.D. at 158-167 (discussing, among others, Cal. Bus. &
Prof. Code §§ 16700, et seq., Cal. Bus. & Prof. Code § 17200,
Fla. Stat. §§ 501.201, et seq., Nev. Rev. Stat. § 598A.060, et
seq., N.Y. Gen. Bus. Law §§ 340, et seq., Tenn. Code. Ann. §§4 7-
25-101, et seq., Wis. Stat. §§ 133.01-133.18).

         The defendants cite a Florida District Court of Appeals
case for the proposition that Florida's consumer protection
statute bars claims by out-of-state consumers. See Coastal
Physician Servs. of Broward County v. Ortiz, 764 So. 2d 7, 8

(Fla. Dist. Ct. App. 1999) (stating that "non-Florida residents cannot make claims under . . . the Deceptive and Unfair Trade Practices Act").  Other Florida cases have reached the opposite conclusion.  See Millennium Commc'ns. & Fulfillment, Inc. v. Office of the Attorney Gen., 761 So. 2d 1256, 1260-61 (Fla. Dist. Ct. App. 2000) (holding that the FDUTPA does apply to commercial transactions involving non-resident consumers); Renaissance Cruises Inc. v. Glassman, 738 So. 2d 436, 437-440 (Fla. Dist. Ct. App. 1999) (affirming trial court's class certification that applied the FDUTPA to a class that included many non-Florida residents).

    This Court has previously held that "[t]he FDUTPA contains no language that would deny relief to either non-Florida residents, or limit its reach to only in-state plaintiffs or Florida businesses."  Wellbutrin XL, 260 F.R.D. at 162.  The Court in Flonase reached a similar conclusion.  See In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 537-38 (E.D. Pa. 2010).

    The defendants also argue that TPPs do not have detailed transaction-level records in the ordinary course of business.  Class notice, the defendants argue, is more effective if the reader can quickly determine whether one is a member of the class.  The defendants explain that TPPs will need to obtain records from their PBMs to learn where pharmacy transactions occurred.  This consideration, however, does not factor heavily

16

in the ease of the application of the law to be applied, but rather addresses a party's own burden to determine if it has a claim.[8]

Upon review of the relevant state policies and contacts, the Court finds that the weight of the relevant factors in this case favors applying the law of the place of purchase to govern the transaction.  The Court will therefore limit the class definition to include only purchases made within the respective states for each class state.

---

[8]    Case law applying other states' choice of law rules go both ways on this issue.  In <u>In re Relafen</u>, the United States District Court for the District of Massachusetts concluded that the more significant contact in an indirect purchaser antitrust case is the location of the sales to end payor plaintiffs.  <u>See In re Relafen Antitrust Litig.</u>, 221 F.R.D. 260, 277-78 (D. Mass. 2004) ("[T]he Court considers the more significant contact in this context to be the location of the injury — that is, the location of the sales to the end payor plaintiffs.").

In <u>K-Dur</u>, Special Master Orlofsky, applying New Jersey's government interest analysis, concluded that individual plaintiffs' claims are governed by their state of residence and TPP's claims are governed by their principal places of business. <u>See In re K-Dur Antitrust Litig.</u>, No. 1419, 2008 WL 2660783, at *5 (D.N.J. Mar. 19, 2008).  <u>See also In re Rezulin Prods. Liab. Litig.</u>, 392 F. Supp. 2d 597, 611 n.85 (S.D.N.Y. 2005) (concluding that the TPP's loss occurred in its home state).  In <u>In re Lorazepam & Clorazepate</u>, the United States District Court for the District of Columbia concluded that Illinois' antitrust law applied for the TPP's reimbursements for purchases made in other states.  <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 295 F. Supp. 2d 30, 50 (D.D.C. 2003) (applying Illinois law to an Illinois TPP's payments for purchases subscribers made in other states).

III. <u>Rule 23 Analysis</u>

      To certify a class under Federal Rule of Civil Procedure Rule 23, a court must find that the action satisfies all four requirements of Rule 23(a) and at least one provision of Rule 23(b).  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997).  The plaintiffs seek certification under Rule 23(b)(3).  Rule 23(b)(3) requires the court to find that questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

      A proper analysis under Rule 23 requires "rigorous" consideration of all the evidence and arguments offered by the parties.  <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 320 (3d Cir. 2008).  A court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." <u>Id.</u> at 320.  Factual determinations necessary for Rule 23 findings must be made by a preponderance of the evidence.  <u>Id.</u> The court must resolve factual or legal disputes relevant to class certification, even if they overlap with the merits. "[W]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."  <u>Id.</u> at 323.  A determination that an

18

expert's opinion is persuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case.  <u>Id.</u> at 324.

    A.  <u>Rule 23(a)</u>

      1.  <u>Numerosity</u>

Rule 23(a)(1) requires a finding that the class is so numerous that joinder of all class members is impracticable. Although there is no precise number for establishing numerosity, classes that exceed forty or more class members generally satisfy this prerequisite.  <u>See</u> <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").  This requirement is easily met in this case because the plaintiffs seek to certify a class of hundreds of thousands of consumer class members and thousands of TPP class members.  <u>See, e.g.,</u> <u>Sheet Metal Workers Local 441 Health & Welfare Plan v.</u> <u>Glaxosmithkline, PLC</u>, No. 04-5898, 2010 U.S. Dist. LEXIS 105646, at *20-21 (E.D. Pa. Sept. 30, 2010) ("<u>Wellbutrin SR</u>").

      2.  <u>Commonality</u>

Rule 23(a)(2) requires that there must be questions of

law or fact common to the class.  To satisfy the commonality
requirement, the class's claims must depend upon a common
contention.  Wal-Mart Stores, Inc. v. Dukes, --- U.S. ---, 180 L.
Ed. 2d 374, 389 (2011).  The common contention must be capable of
class-wide resolution.  Id. at 390.  A contention is capable of
class-wide resolution if determination of its truth or falsity
will resolve a central issue to the validity of the claims "in
one stroke."  Id.  A single common question is sufficient.  Id.
at 395.

     The Court finds that commonality requirement is met
here.  The plaintiffs allege that the defendants engaged in a
scheme to delay the entry of less expensive generic versions of
Wellbutrin XL into the market.  The plaintiffs contend that this
scheme caused 300 mg bupropion hydrochloride to enter the market
in December, 2006 instead of in November, 2005 and that the
scheme limited entry of 150 mg generic Wellbutrin until May,
2008.  Each class member's claims depend on whether or not the
defendants unlawfully engaged in anticompetitive behavior to
limit the entry of generic competitors in violation of each
state's respective antitrust and/or consumer protection laws.
See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516,
528 (3d Cir. 2004) (certifying settlement class) ("[P]roof of
liability for DuPont's conduct under § 2 of the Sherman Act and
the Delaware Consumer Fraud statute depends on evidence which is

20

common to the class members . . . .").  Although this action is
brought under the law of six different states, proof of the
essential elements of these statutes will also require common
proof.  The antitrust laws and consumer protection laws for these
six states do not differ in material respects.  See Wellbutrin
XL, 260 F.R.D. at 158-68 (discussing plaintiffs' remaining
claims).

      3.  Typicality

      Rule 23(a)(3) requires that the claims or defenses of
the representative parties be typical of the claims or defenses
of the class.  The typicality requirement ensures that the class
representatives' interests are aligned with those of the absent
class members, so that the representatives work to benefit the
class as a whole.  In re Prudential Ins. Co. Am. Sales Practice
Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998).  "The
concepts of commonality and typicality are broadly defined and
tend to merge."  Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir.
1994) (citing 7A Charles A. Wright, et al., Federal Practice and
Procedure § 1764).

      If the representative's claims and those of the absent
class members arise from the same course of conduct and are based
on the same legal theories, the class satisfies typicality,
regardless of factual differences underlying the individual

21

claims.  <u>Baby Neal v. Casey</u>, 43 F.3d at 57-58.  The Court finds
that the typicality requirement is met here because the
representatives' claims arise from the same course of conduct and
are based on the same legal theories.  <u>See, e.g.</u>, <u>Wellbutrin SR</u>,
2010 U.S. Dist. LEXIS 105646, at *22-23 (E.D. Pa. Sept. 30, 2010)
("[T]he typicality requirement is met because GSK's alleged
conduct gives rise to all of their claims.").

### 4.   Adequacy of Representation

Rule 23(a)(4) requires that the proposed class
representative will fairly and adequately protect the interests
of the class.  The United States Court of Appeals for the Third
Circuit has held that adequacy of representation depends on two
factors: (a) the plaintiff's attorney must be qualified,
experienced, and generally able to conduct the proposed
litigation, and (b) the plaintiff must not have interests
antagonistic to those of the class.  <u>New Directions Treatment
Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007).

The Court finds that the first prong is satisfied.
Counsel for the plaintiffs are well-qualified to represent the
proposed class in this case.  They have extensive experience in
similar class actions involving delayed generic competition.
<u>See, e.g.</u>, <u>In re Warfarin Sodium Antitrust Litigation</u>, 391 F.3d
516 (3d Cir. 2004).  The plaintiffs' counsel also have vigorously

and capably prosecuted this action.

The absence-of-conflict requirement "seeks to uncover conflicts of interest between named parties and the class they seek to represent." Warfarin Sodium, 391 F.3d at 532 (internal quotation marks omitted). This requirement is not defeated merely "because of a potential conflict of interest that may not become actual." Kohen v. Pac. Inv. Mgmt. Co. LLC, 571 F.3d 672, 680 (7th Cir. 2009).

The defendants contest the absence-of-conflict requirement in two ways. First, the defendants argue that no named plaintiff is an adequate representative for Florida, Nevada, New York, or Wisconsin because no named plaintiff, other than Aetna, made generic purchases in these states and Aetna was allowed to intervene only as a potential class representative for California. Second, the defendants argue that the plaintiffs have antagonistic interests to some absent class members because of the pending suit regarding the quality of one generic manufacturer's version of 300 mg bupropion hydrochloride. See In re Budeprion XL Mktg. & Sales Litig., MDL No. 2107, 2010 U.S. Dist. LEXIS 51980 (E.D. Pa. May 26, 2010) (Schiller, J.) (denying defendants' motion to dismiss).

As to the first argument, the Court agrees, as explained below in the antitrust impact section, that a plaintiff that did not make generic purchases in a class state cannot

demonstrate antitrust impact with common evidence and, therefore, cannot be a class representative.  But the Court will allow Aetna to be substituted as a representative states in which the current named plaintiff did not make an in-state generic purchase.[9]

The defendants argue that the Court permitted Aetna to intervene only for claims under the laws of California and decision is the law of the case.  "The doctrine of the law of the case dictates that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation."  Deisler v. McCormack Aggregates, Co., 54 F.3d 1074, 1086 (3d Cir. 1995) (internal quotations omitted). If the doctrine of the law of the case does not foreclose intervention, the defendants argue that substitution of Aetna would be prejudicial.

The Court is not persuaded that the law of the case doctrine forecloses Aetna from representing claims in the other class states.  This issue was not directly decided previously. The Court's reasoning in granting Aetna's motion was that it would not be unfair for the plaintiffs to pursue claims that have

---

[9]     This substitution applies to New York, Wisconsin, and Nevada.  The defendants note that Painters No. 30's Nevada purchase was actually transacted in Illinois.  The defendants also argue that Local 505 made purchases in Florida through a mail order facility.  Defs.' Opp'n at 38-41; Pls.' Supp. Reply at 11-13 n.8, 11.  Although Local 505's generic mail order purchases appear to the Court to be a Florida transaction, Aetna's purchases are also sufficient to state a claim under Florida law.

already been subject to discovery.  See Sept. 21, 2010 Order at 2
(Docket No. 200) ("Although the Court was unwilling to allow
Aetna to intervene to assert a wide swath of new claims, the
intervention requested herein applies only to claims the
plaintiffs and defendants have already been litigating.").

Courts may allow class counsel to identify new class
representatives who meet Rule 23(a) requirements.  See Manual for
Complex Litigation (Fourth) § 21.26 ("[C]ourts generally allow
class counsel time to make reasonable efforts to recruit and
identify a new representative who meets the Rule 23(a)
requirements.  The Court may permit intervention by a new
representative or may simply designate that person as a class
representative in the order granting class certification.").

The defendants oppose this substitution and cite In re
Flash Memory Antitrust Litig., No. 07-86, 2010 WL 2332081, at *17
(N.D. Cal. June 9, 2010).  In Flash Memory, the plaintiffs
proposed substituting nine new plaintiffs in place of the twelve
currently-named plaintiffs.  Id.  Aetna's requested substitution
would not cause the prejudice of the substitution in Flash
Memory.  Aetna is a single entity that has already been actively
involved in this case as a named plaintiff.  Aetna has also
produced discovery for each of the six proposed class states.

As to the second argument of the defendants, the Court
finds that the Budeprion XL litigation does not create a conflict

25

that would defeat class certification because these two law suits
address different, compatible issues.  Absent class members who
are pursuing damages from allegedly inferior extended-release
bupropion hydrochloride would still benefit as much as any other
class member from an adjudication that they are entitled to
overcharge damages for the purchases that they did make.

The Court is satisfied that the named plaintiffs, as
modified to allow Aetna to represent states in which other named
plaintiffs have not purchased bupropion hydrochloride, will
adequately represent the interests of absent class members.


B.    Rule 23(b)

Once the requirements of Rule 23(a) are satisfied, a
plaintiff must also satisfy one of the three criteria in Rule
23(b).  The plaintiff seeks to have this class certified under
Rule 23(b)(3).  Rule 23(b)(3) requires the court to find (1) that
questions of law or fact common to class members predominate over
any questions affecting only individual members and (2) that a
class action is superior to other available methods for fairly
and efficiently adjudicating the controversy.  These are often
referred to as the predominance and superiority requirements.
The Court addresses each requirement in turn.

26

1.   Predominance

To establish predominance, the plaintiffs must show by a preponderance of the evidence that the elements of their claims can be proven by evidence common to all in their class.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311-12 (3d Cir. 2008).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  Id. at 311 (quoting Newton, 259 F.3d at 172).  The elements of the plaintiff's claims are (1) a violation of the state antitrust laws and/or state consumer protection laws, (2) individual injury, and (3) measurable damages.  See id. at 311. The Court will address whether the plaintiff has shown that its claims can be proven with common evidence for each of these three elements.  The primary issue of contention is whether the plaintiffs can demonstrate antitrust impact to all putative class members, particularly TPPs who did not purchase generic extended-release bupropion hydrochloride after it became available.

a.   Violation of State Antitrust and Consumer Protection Laws

The plaintiffs have successfully pled antitrust claims arising under the laws of California, New York, Nevada, Tennessee and Wisconsin, and consumer protection claims arising under the laws of California and Florida.  See Wellbutrin XL, 260 F.R.D. at 168; Wellbutrin XL, 756 F. Supp. 2d at 682.

27

Proof of antitrust violations and consumer protection laws in this case involve predominantly common issues. If each class member pursued its claims individually, the class member would have to prove the same antitrust and consumer protection violations using the same documents, witnesses, and other evidence. The issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004) (noting that liability for anticompetitive conduct focuses on the defendants' actions, not the conduct of individual class members).

b.   Antitrust Impact

The plaintiffs must also demonstrate that antitrust impact, also known as individual injury or antitrust injury, can be proven with common evidence.[10]  "[T]o prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." Hydrogen Peroxide, 552

---

[10]   As an initial matter, the Court notes the difference between antitrust impact and the calculation of damages. "In antitrust and securities fraud class actions, '[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury).'" Hydrogen Peroxide, 552 F.3d at 311 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 188 (3d Cir. 2001)).

F.3d at 311.  The Court of Appeals has observed that antitrust impact often is critically important for the purpose of evaluating the predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof.  Id.

At the class certification stage, a plaintiff's burden is not to prove the element of antitrust impact.  The plaintiff must instead demonstrate that the element of antitrust impact is "capable of proof at trial through evidence that is common to the class rather than individual to its members."  Id. at 311-12. The district court must conduct a "rigorous" assessment of the available evidence and the method or methods by which the plaintiff proposes to use the evidence to prove impact at trial. Id. at 312.

The Court will first discuss whether the plaintiffs have shown that antitrust impact can be demonstrated for purchasers of generic extended-release bupropion hydrochloride ("the generic overcharge").  Second, the court considers whether antitrust impact can be demonstrated for entities who purchased Wellbutrin XL (the "branded overcharge").  This group includes both entities that did and did not purchase generic extended-release bupropion hydrochloride after it became available. Third, the Court briefly considers direct-to-consumer advertising, which the defendants argue will prevent class-wide

treatment.  Fourth, the Court discusses whether the plaintiffs must show that an illegal overcharge is "passed through" to the end purchasers.

(1)   Impact to Generic Purchasers

The Court first turns to the plaintiffs' theory of generic overcharge.  The Court must address whether common evidence can demonstrate that generic prices in the but-for world would have been lower than they were in the real-world. Professor Rosenthal proposes to use the "yardstick" methodology to demonstrate that the prices of generic extended-release bupropion hydrochloride in the real world were higher for actual purchases than they would have been, but for the defendants' alleged exclusionary conduct.  Professor Rosenthal concludes that class members suffered an overcharge for each generic purchase because prices for generic extended-release bupropion hydrochloride quickly decrease after market entry.  If extended-release bupropion hydrochloride had entered the market sooner, prices would have been correspondingly lower for every purchase. N.T. at 68-69.

Professor Rosenthal relies on empirical data from IMS Health for actual transactions of extended-release bupropion hydrochloride and then "backcasts" the data to the "but for" generic entry date.  N.T. at 45.  The methodology examines what

30

actually happened after generic entry to conclude that prices for
generics would have been lower if they had entered the market
sooner.  Professor Rosenthal supports this conclusion with data
showing a rapid erosion in generic prices after market entry.
See N.T. at 46 ("I construct my yardsticks by . . . in effect,
rolling back in time the actual marketing events. . . . I
observed . . . the price erosion was also rapid after that first
six-month period.  So, the price discount for the generic was
initially, approximately 15 percent.  And, in my data that goes
to 40 percent price discount, again relative to the pre-launch
brand price.  So, both substitution and price effects were fairly
dramatic.").

          The defendants' expert Dr. Joskow criticizes the
plaintiffs' methodology for generic overcharge by noting that
some entities paid lower prices in the actual world than
Professor Rosenthal's average "but for" price for the same time
period.  For example, named plaintiff D&C 30 made generic
purchases in Florida that were below Professor Rosenthal's
average "but for" generic price.  Professor Rosenthal explained,
however, that this example fails to show that D&C was not
impacted.  Dr. Joskow's analysis of specific transactions drew
conclusions based on contemporaneous prices.  These comparisons
did not account for the fact that if the generic entered the
market a year and a half earlier, earlier entry would have

affected contemporaneous prices.  D&C's actual generic purchase
price, though lower than the "but for" average, would likely have
been even lower because of the downward trend in generic prices
over time.  <u>See</u> N.T. at 58.  The Court concludes that class-wide
evidence is available to show antitrust impact in the form of a
generic overcharge.

          (2)   <u>Impact to Purchasers of Wellbutrin XL</u>

              (a)   <u>Entities That Did Not Purchase
Generics</u>

        The plaintiffs assert that TPPs suffered antitrust
impact for purchases of Wellbutrin XL even if they did not
purchase generic extended-release bupropion hydrochloride after
it became available because of the high substitution rate from
branded drugs to generic drugs.  The plaintiffs argue that in a
but-for world, each TPP would have converted some branded
purchases to generic extended-release bupropion hydrochloride and
thereby incurred antitrust injury.  The defendants counter that
there is no way to differentiate which TPPs would continue to
make only branded purchases even after generics entered the
market and thereby suffer no impact.

        Professor Rosenthal relies on a probability analysis to
conclude that TPPs suffered antitrust impact without considering
generic purchases.  She calculates the likelihood that any
potential class member would have no generic claims based on the

32

average generic substitution rate of 86% for the 300 mg dosage.
See Rosenthal Reb. Decl. ¶ 23.  Professor Rosenthal notes that
"most third party payors will have large numbers of claims for
either the brand or generic Wellbutrin XL during the class
period. . . ."  Id.  But even for a TPP with only 10 claims for
Wellbutrin XL 300 mg tablets during the period prior to generic
entry, Professor Rosenthal calculates the probability that the
TPP would have no generic claims in the but-for world as 3 in one
billion.  Professor Rosenthal opines that "even if a potential
Class member presents with only one Wellbutrin XL claim during
the first year of the Class Period . . . it is still more likely
than not that such a claim would have been switched to a
generic."  Id.

The defendants argue that Professor Rosenthal
mistakenly assumes that each purchase is an independent event.
Dr. Joskow argues that each individual prescription is not
necessarily an independent event because people often fill
multiple prescriptions at a time and TPPs may be subject to
formularies that prefer certain branded versions.  For example,
named plaintiff Local 505's members made 13 consecutive purchases
of branded Wellbutrin XL in the two year period after generic
entry, during which time it made no corresponding purchases of
generic.  See Defs.' Hr'g Ex. 3.

The example of Local 505 demonstrates the influence of

33

formularies or preferred drug lists on individuals' purchasing
behavior.  Professor Rosenthal testified that Local 505
contracted with Blue Cross Blue Shield of Alabama for pharmacy
benefits.  Blue Cross Blue Shield of Alabama has preferred drug
lists, and it did not remove Wellbutrin XL from its preferred
drug lists until the entry of 150 mg generic extended-release
bupropion hydrochloride in 2008.  N.T. at 64-65.  Local 505's
members correspondingly continued to purchase branded Wellbutrin
XL for nearly two years after initial generic entry.

The experience of Local 505 suggests that there may be
significant individual issues for class members regarding whether
an individual TPP suffered antitrust impact if it did not
actually purchase generics.  Professor Rosenthal conceded that
many TPPs had very few purchases in the six class states, and
that such purchases are not fully independent.  N.T. 85, 90, 94.
These admissions undermine the reliability of her method to
demonstrate antitrust impact for TPPs without showing that the
TPP purchased extended-release bupropion hydrochloride.

The Court is not persuaded that the plaintiffs have
shown by a preponderance of the evidence that antitrust impact
under a given state's law can be demonstrated for every TPP class
member without showing that the TPP purchased generics in that
state after generics became available.  In this case, it is
unclear how many TPPs made small purchases of Wellbutrin XL in

class states without making any generic purchases.  The example
of Local 505 suggests that individual issues, such as formulary
preference or brand loyalty, may impact whether a particular TPP
would have switched from branded Wellbutrin XL to generic
extended-release bupropion hydrochloride in the but-for world, if
a TPP did not actually purchase any generics.  The Court
concludes that the plaintiffs have failed to demonstrate that
antitrust impact can be shown with common evidence without
showing that the TPP purchased generic extended-release bupropion
hydrochloride after it became available.


                    (b)   <u>Entities That Did Purchase Generics</u>
              For entities that did purchase extended-release
bupropion hydrochloride in a class state after it became
available, it is a reasonable inference that these entities would
have purchased extended-release bupropion hydrochloride in the
"but for world," absent the alleged exclusionary conduct.
Professor Rosenthal presented evidence that brand-to-generic
switching following generic entry is a demonstrable and recurrent
phenomenon.  Professor Rosenthal used IMS market data and data
from GSK to conclude that the substitution from generic was
"rapid."  N.T. at 44.  The price discount between branded and
generic is approximately 15% off-brand after generic entry.  As
more generic competitors enter the market, the discount

increases.  N.T. at 47.

        The defendants' expert, Dr. Joskow, argued that TPPs
were not necessarily overcharged when they purchased branded
drugs instead of generics.  He cites the example that Aetna,
immediately after generics came on to the market, actually paid
more for generics than for branded for several transactions.  The
defendants explain that upon generic entry, rebates from the
branded manufacturer to TPPs largely disappear.  Joskow Decl.
¶¶ 79-80.  For payors like Aetna, this can cause the net cost of
a generic drug to exceed the net cost of the branded drug for a
period of time.

        Professor Rosenthal rebutted this argument by
explaining that Dr. Joskow's analysis inappropriately compared
contemporaneous transactions to conclude that the price of
generics were higher than the price of branded Wellbutrin XL.
Professor Rosenthal noted that if generics had entered the market
earlier, the price of generics would have already decreased.  To
demonstrate overcharge, Professor Rosenthal explained, one must
compare the but-for generic price to the actual branded price.
N.T. at 47.

        The Court concludes that the plaintiffs have shown
class-wide evidence is available to demonstrate that the price of
generic extended-release bupropion hydrochloride would have been
lower than Wellbutrin XL absent the defendants' anticompetitive

conduct.  Because the court limits the availability of the
branded overcharge theory to entities that purchased generic
Wellbutrin XL in a class state, the plaintiff has also shown that
the class members would have substituted at least some generic
extended-release bupropion hydrochloride for Wellbutrin XL during
the class period.  Cf. In re Warfarin Sodium Antitrust Litig.,
391 F.3d 516, 531 (3d Cir. 2004) (certifying settlement class)
("Notably, TPPs . . . suffered direct economic harm when . . .
they paid supracompetitive prices for Coumadin instead of
purchasing lower-priced generic warfarin sodium.").


(3)  Direct-to-Consumer Advertising

        The defendants argue that there are many individuals
who purchased Wellbutrin XL due to GSK's advertising campaign who
would not have purchased it in the "but for world" because GSK
would not have continued its advertising campaign after generic
entry.  Professor Rosenthal credibly testified that she had not
seen any evidence of an effect for direct-to-consumer advertising
in this case.  N.T. at 37.  Professor Rosenthal's damage
methodology, discussed below, is also designed to account for any
decreased volume associated with the defendants' promotional
activities.  See Rosenthal Reb. Decl. ¶ 42 ("I calculated a
yardstick reflecting the actual market volume trend in the actual
world after actual generic launch, thus capturing any decrease in

sales due to the cessation of promotional spending by
Defendants."). The Court is persuaded that the possible effect
of direct-to-consumer advertising is insufficient to bar class
certification.

### (4)   Pass Through

The parties dispute whether the plaintiffs must
demonstrate that an illegal overcharge has been "passed through"
to indirect purchasers, rather than simply showing that the price
actually paid for either branded or generic Wellbutrin XL was
higher than the price the plaintiffs would have paid for generic
Wellbutrin XL. Prior cases that addressed delayed generic entry
for indirect purchasers have not required an analysis of whether
an overcharge has been "passed through" because other techniques
are available to demonstrate overcharge to indirect purchasers.
See, e.g., In re Cardizem CD Antitrust Litig., 200 F.R.D. 326,
344 (E.D. Mich. 2001) ("[A]n indirect purchaser must estimate
only the 'but for' price that it should have paid, which is a far
less exacting exercise than apportioning the overcharge
throughout the entire chain of distribution.") (quoting Roger D.
Blair & Jeffrey L. Harrison, Reexamining the Role of Illinois
Brick in Modern Antitrust Analysis, 68 Geo. Wash. L. Rev. 1, 29
(1999)).

Professor Rosenthal presented evidence that the pricing

structure in the pharmaceutical industry is based on formulaic markups.  <u>See</u> Rosenthal Reb. Decl. ¶¶ 27-32; N.T. 41-42.  Generic overcharges, Professor Rosenthal notes, can also be demonstrated as the difference in generic list prices.  <u>See</u> <u>id.</u> ¶ 33 ("[G]eneric pricing overcharges . . . for direct and indirect purchases would be caused by a single mechanism: differences between generic list prices . . . in the actual and but-for scenarios.").  <u>See also</u> N.T. at 106.  This case is distinguishable from component cases that may involve much more complicated questions about the effect that a supracompetitive component had on the final purchase price for an end user.  <u>Cf.</u> <u>In re Flash Memory Antitrust Litig.</u>, No. 07-0086, 2010 U.S. Dist. LEXIS 59491, *44 (N.D. Cal. March 31, 2010); <u>In re Graphics Processing Units Antitrust Litig.</u>, 253 F.R.D. 478, 502 (N.D. Cal. 2008).

The Court concludes that Professor Rosenthal has set forth a viable method to demonstrate antitrust impact for generic and branded overcharges.  <u>See</u> <u>In re Cardizem CD Antitrust Litig.</u>, 200 F.R.D. 326, 344 (E.D. Mich. 2001) (concluding pass-through variations are not necessary to demonstrate antitrust impact). <u>Cf.</u> <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 531 (3d Cir. 2004) ("[I]t [is] well recognized that a purchaser in a market where competition has been wrongfully restrained has suffered an antitrust injury, and in this case, TPPs are such

purchasers.").

The plaintiffs have demonstrated that antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members for generic overcharges.  Professor Rosenthal has presented class-wide evidence to demonstrate the existence of both a generic and branded overcharge.

c.  <u>Measurable Damages</u>

At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis.  <u>See</u> <u>In re Neurontin Antitrust Litig.</u>, MDL No. 1479, 2011 U.S. Dist. LEXIS 7453, at *40 (D.N.J. Jan. 25, 2011); <u>Bell Atl. Corp. v. AT&T Corp.</u>, 339 F.3d 294, 303 (5th Cir. 2003) (noting that antitrust plaintiffs must provide a "just and reasonable estimate of the damage based on relevant data.").

The plaintiffs' proposed methodology for calculating damages relies on the use of "yardsticks" as discussed above. The plaintiffs' expert, Professor Rosenthal, explains that this methodology uses actual prices and quantities from the market to derive "yardsticks" to simulate the prices and quantities that would have occurred but for the anticompetitive activity.  These

40

prices and quantities are used to estimate the total and average

overcharge damages to the class.  <u>See</u> Rosenthal Supp. Dec. ¶ 14.

This methodology was criticized in the <u>Wellbutrin SR</u>

decision because it relies on average pricing data.  <u>See</u>

<u>Wellbutrin SR</u>, 2010 U.S. Dist. LEXIS 105646, at *101-102 (E.D.

Pa. Sept. 30, 2010) ("Just because an average price was increased

or decreased by the alleged foreclosure does not mean that all

members of the proposed class paid supra-competitive prices or

that any damage for an individual end-payor could be calculated

in a formulaic way by common proof.").

Dr. Joskow likewise suggested that the use of average

yardsticks may gloss over meaningful differences, and a yardstick

should be developed for each class member.  The plaintiffs

counter that the defendants' expert recognizes that it is

"possible" to use averages and sampling to assess claims and that

the defendants' approach is impractical.  Aetna alone paid

138,000 extended release bupropion hydrochloride claims in

California during the class period.  Under Dr. Joskow's approach,

to assess impact for just Aetna's claims under California law

would require analysis of each of the 138,000 transactions.  The

plaintiffs note that Dr. Joskow acknowledged that "there may be

ways to do it within each individual class member that doesn't

require you to do it 138,000 times . . . ."  Pls.' Reply at 21.

The Court agrees that the use of averages may not

always be appropriate, particularly in indirect purchaser actions. See generally ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005). In this case, however, Professor Rosenthal has demonstrated that after generics became available, the actual prices for generic extended-release bupropion hydrochloride were higher than the corresponding prices would have been in the but-for world and that "but-for" generic prices would be lower than branded prices. N.T. at 60-61; 69-71. The use of averages in this case does not mask meaningful variations in overcharges, and it provides a reliable method to provide a reasonable estimate of the damages based on relevant purchase data. The Court concludes that the plaintiffs have set forth a satisfactory methodology to estimate class-wide damages resulting from the alleged generic overcharges.

### 2.   Superiority

The Court considers whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d

42

Cir. 1998).  It is meant to ensure that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615 (quoting Advisory Committee's Note on Fed. R. Civ. P. 23).

The Court finds that the superiority requirement is met here.  Although the plaintiffs wish to proceed under the laws of six different states, the Court concludes that variations among the laws at issue here do not "present the types of insuperable obstacles which render class action litigation unmanageable."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 529 (3d Cir. 2004).  Individual treatment of each class members' claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy.  Class resolution would also avoid problems of inconsistent resolution.

IV.  Conclusion

The Court concludes that the plaintiffs have satisfied their burden to certify a class of indirect purchasers of generic extended-release bupropion hydrochloride under the antitrust laws of California, Nevada, New York, Tennessee, and Wisconsin, and the consumer protection laws of California and Florida.

An appropriate order will follow separately.

43