# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re WELLBUTRIN XL ANTITRUST LITIGATION | ) ) ) ) | Civil Action No.: 2:08-cv-2433 |
| THIS DOCUMENT RELATES TO: | ) ) ) | Honorable Mary A. McLaughlin |
| INDIRECT PURCHASER ACTION | ) ) ) |  |

**MEMORANDUM OF LAW IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS'
AND CLASS COUNSEL'S APPLICATION FOR AWARDS OF INCENTIVE
PAYMENTS, FEES AND REIMBURSEMENT
<u>OF EXPENSES FROM THE PROPOSED CLASS ACTION SETTLEMENT</u>**

**LOWEY, DANNENBERG,
COHEN& HART, P.C.**
Richard W. Cohen
Peter D. St. Phillip, Jr.
Gerald Lawrence
Uriel Rabinovitz
One North Broadway
White Plains, NY 10601
Telephone: (914) 997-0500
Telecopier: (914) 997-0035
E-mail: pstphillip@lowey.com

**WEXLER WALLACE LLP**
Kenneth A. Wexler
Thomas A. Doyle
Amber M. Nesbitt
Justin N. Boley
55 W. Monroe Street
Chicago, IL 60603
Telephone: (312) 346-2222
Telecopier: (312) 346-0022
E-Mail:
kaw@wexlerwallace.com

**BRANSTETTER STRANCH
& JENNINGS, PLLC**
James G. Stranch, III
J. Jan Jennings
J. Gerard Stranch, IV
Joseph P. Leniski
227 Second Avenue North
Nashville, TN 37201
Telephone: (615) 254-8801
Telecopier: (615) 255-5419
EMail:jims@branstetterlaw.com

*Plaintiffs' Co-Lead Class Counsel*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT .............................................................................................................................. 11

CONCLUSION ........................................................................................................................... 20

## TABLE OF AUTHORITIES

## Cases

*Abrams v. Lightolier, Inc.,*
  50 F.3d 1204 (3d Cir. 1995)..................................................................................22

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) ............................................................................................10

*Bradburn Parent Teacher Store v. 3M,*
  513 F. Supp. 2d 322 (E.D. Pa. 2007) ............................................................. 12, 19

*Cassese v. Williams,*
  Nos. 11-cv-4333, 2012 WL 5861804 (2d Cir. Nov. 20, 2012).............................14

*Cullen v. Whitman Medical Corp.,*
  197 F.R.D. 136 (E.D. Pa. 2000)...........................................................................16

*Durant v. Traditional Investments, Ltd.,*
  No. 88 Civ. 9048, 1992 WL 203870 (S.D.N.Y. Aug. 12, 1992)...........................19

*Eisen v. Carlisle and Jacquelin,*
  417 U.S. 156 (1974) ............................................................................................20

*Gunter v. Ridgewood Energy Corp.,*
  223 F.3d 190 (3d Cir. 2000)........................................................................... 11, 12

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ..............................................................................13, 18, 24

*In re AT&T Corp.,*
  455 F.3d 160 (3d Cir. 2006)................................................................................12

*In re Cendent Corp.,*
  832 F. Supp. 2d 327 (D.N.J. 2002)......................................................................22

*In re Children's Ibuprofen Oral Suspension Antitrust Litig.,*
  04-mc-00535-ESH; (D.D.C. Apr. 24, 2006) .......................................................21

*In re Diet Drugs,*
  582 F.3d 524 (3d Cir. 2009)..........................................................................10, 11

*In re Ikon Office Solutions, Inc.,*
  194 F.R.D. 166 (E.D.Pa. 2000) ...........................................................................19

*In re Ins. Brokerage Antitrust Litig.,*
  579 F.3d 241 (3d Cir. 2009)................................................................................11

*In re Linerboard Antitrust Litig.,*
  MDL No. 1261, 2004 WL 1221350 (E.D.Pa. 2004)......................................23, 25

*In re Lorazepam & Clorazepate Antitrust Litig.,*
  205 F.R.D. 369 (D.D.C. 2002) ............................................................................23

*In re Mercury Interactive Corp. Secs. Litig.,*
  618 F.3d 988 (9th Cir. 2010)...............................................................................14

*In re Orthopedic Bone Screws Prod. Liab. Litig.,*
  MDL No. 1014, 2000 WL  1622741 (E.D. Pa. Oct. 23, 2000)...........................19

*In re Prudential Ins. Co.,*
  148 F.3d 283(3d. Cir.1998) ................................................................................11

*In re Remeron End-Payor Antitrust Litig.*, 02-cv-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005)..................................................................................................................................25

*In re Rite Aid Corp. Secs. Litig.*,
146 F. Supp. 2d 706 (E.D. Pa. 2001) ...............................................................................16

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231(D. Del. 2002) .....................................................................................20, 21

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)..............................................................................................10

*In re Wellbutrin XL Antitrust Litig.*,
260 F.R.D. 143 (E.D. Pa. 2009) ..........................................................................................5

*In re Wellbutrin XL Antitrust Litig.*,
268 F.R.D. 539 (E.D. Pa. 2010) ..........................................................................................5

*In re Wellbutrin XL Antitrust Litig.*,
756 F. Supp. 2d 670 (E.D. Pa. 2010) ..................................................................................6

*In re: Remeron Antitrust Litig.*,
No. 03-085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005).....................................................19

*In re: Rite Aid Secs. Litig.*,
396 F.3d 294 (3d Cir. 2005).................................................................................13, 16, 20

*Komar v. Cassese*,
No. 12-1031, 2013 WL 655187 (Apr. 29, 2013) ..............................................................15

*Lanni v. State of New Jersey*,
259 F.3d 146 (3d Cir. 2001)..............................................................................................21

*Meijer, Inc. v. 3M*
No. 04-5871, 2006 WL 2382718 (E.D. Pa Aug. 14, 2006) ..............................................21

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ..........................................................................................................21

*Oh v. AT&T Corp.*,
225 F.R.D. 142 (D.N.J. 2004) ...........................................................................................22

*Phemister v. Harcourt Brace Janovich, Inc.*,
No. 77 C 39, 1984 WL 21981(N.D. Ill. Sept. 14, 1984) ..................................................19

*Phillips v. Phila. Hous. Auth.*,
No. 00-4275, 2005 U.S. Dist. LEXIS 34606 (E.D. Pa. Dec. 20, 2005).............................21

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) ............................................................................................................12

*Rode v. Dellarciprete*,
892 F.2d 1177 (3d Cir. 1990) ...........................................................................................21

*Segen v. OptionsXpress Holdings Inc.*,
631 F. Supp. 2d 645 (D. Del. 2009) ..................................................................................22

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ......................................................................................................6, 16

**Other Authorities**

Illinois' Antitrust Act ("IAA") ...................................................................................................5

New York's Donnelly Act..............................................................................................................5

Newberg on Class Actions
(4th ed. 2006)......................................................................................................................15

THE MANUAL FOR COMPLEX LITIGATION
  (4th ed. 2004)..................................................................................................10, 18

**Rules**

FED. R. CIV. P. 23 ...................................................................................................1, 13

## INTRODUCTION

After nearly four years of mostly active litigation, Plaintiffs and the Certified Class which they represent (the "Class"), through their appointed Co-Lead Class Counsel ("Class Counsel"), negotiated a settlement with Defendant Valeant Pharmaceuticals International, Inc., f/k/a Biovial Corp., Biovail Laboratories, Inc., and Valeant International Bermuda, f/k/a Valeant International (Barbados) SRL f/k/a Biovail Laboratories International SRL (together, "Valeant").  The Class agreed to settlement terms requiring Valeant to deposit $11,750,000.00 in an escrowed interest-bearing account ("Gross Settlement Fund") shortly before the Court's final approval hearing in exchange for the Class releasing their claims under the laws of six states.[1]  In addition to this cash settlement fund, the Class, through Class Counsel, negotiated for Valeant to pay 50% of the costs of notice administration directly to the Court-appointed Notice Administrator, Heffler Claims Administration, up to a total of $500,000.00.

This is a significant achievement given that the Court had granted summary judgment in Valeant's favor on a portion of the Class' claims and the risks of securing a favorable judgment on the remaining claims.  Class Counsel prosecuted this case on a contingency fee basis and has yet to be paid for their labors in securing this recovery.  This brief provides the Court with the reasons why Class Counsel seeks:  (1) incentive awards totaling $60,000 for class representatives Aetna Health of California ("Aetna"), Plumbers & Pipefitters Local 572 Health and Welfare Fund, ("Local 572"), and Painters District Council No. 30 Health and Welfare Fund ("Painters"); (2) an attorneys' fee award, pursuant to FED. R. CIV. P. 23(h), of 33.33% of the Gross Settlement Fund ($3,916,275); and (3) reimbursement of litigation expenses advanced on behalf of the Class totaling $1,279,514.86.

---

[1] Plaintiffs filed the Settlement Agreement with the Court as part of their preliminary approval papers. Dkt. No. 454-1.

The incentive awards, totaling $60,000, are reasonable, consistent with Third Circuit jurisprudence, and designed to compensate the named class representatives for their role in serving as Class Representatives and their significant contributions to this litigation.  The $1,279,514.86  in expenses, as detailed in Ex. U to the supporting Declaration of Peter D. St. Phillip, Jr. ("*Second St. Phillip Decl.*"),[2] represent amounts paid for expert witnesses, the cost of travel, deposition transcripts and other matters reasonably incurred in Class Counsel's efforts to prosecute this case.  In addition, Class Counsel and other counsel that worked on this matter have submitted a combined lodestar of $14,883,615.50.  *See id.*  A fee award of $3,916,275.00 represents only approximately 26.31% of the accrued lodestar.

For the reasons detailed herein, Class Counsel respectfully requests that the Court award the requested amounts.

## BACKGROUND

The Court and the parties have worked very hard in this case.  The Court issued five published and unpublished decisions on a range of issues relating to the indirect purchaser suit.[3] The litigation presented knotty questions of first impression concerning, *inter alia*, (1) the intersection of substantive rights under state antitrust law and procedural limitations under state class action rules; (2) choice of law questions concerning Article III standing and class certification; (3) the commonality of antitrust impact proof among retail purchases of brand and

---

[2] Because Mr. St. Phillip also submitted a declaration in connection with preliminary approval, Plaintiffs refer to the current declaration as "Second St. Phillip Decl." to avoid any confusion. This Declaration compiles exhibits cited and relevant to this Application and the concurrently-filed Motion for Final Approval of the Valeant Settlement.

[3] *See, In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009) (motions to dismiss); *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539 (E.D. Pa. 2010) (denying intervention); *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670 (E.D. Pa. 2010) (leave to amend complaint); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126 (E.D. Pa. 2011) (class certification); and *In re Wellbutrin XL Antitrust Litig.*, Nos. 08-2431, 08-2133, 2012 WL 1657734 (E.D. Pa. May 11, 2012) (summary judgment).

generic drugs; and (4) application of petitioning immunity to state law unfair trade practices statutes.  The parties vigorously litigated difficult questions of class certification law and presented sophisticated pharmacoeconomic evidence to the Court through multiple expert submissions and live testimony.  Approximately three hundred thousand documents were reviewed, and more than fifty fact and expert witness depositions were conducted.  This pretrial work culminated in extensive summary judgment briefing and argument.  Beyond the choice-of-law, standing, and other issues presented by prosecuting unfair trade practices act and antitrust claims under a variety of state laws, the patent and antitrust issues in this Hatch-Waxman Act litigation were complex.

This lawsuit was risky, prolonged and expensive.  The Court's summary judgment decision in favor of Valeant on Plaintiffs' "sham petitioning" claims brought under the state law analogues to the Sherman Act's prohibition on monopolization vividly displayed the pitfalls on the road to recovery.  In the wake of this ruling, Class Counsel settled the Class' claims against Valeant, while continuing to litigate the remaining claims against co-defendant SmithKline Beecham d/b/a GlaxoSmithKline ("GSK").  This settlement strategy has the benefit of ensuring cash to the Class (subject to the Court's approval) and a further opportunity to recover more in the future.  The Settlement represents an excellent result and should be approved.

In this brief, filed contemporaneously with a separate brief related only to the fairness and adequacy of the settlement, Class Counsel provides the Court with reasons justifying its request for awards of: (1) incentive payments for the certified class representatives; (2) attorneys' fees; and (3) reimbursement of expenses.  Below we outline the pertinent history of this case as a backdrop against which the Court can weigh the factors relevant to these awards.

## I.      Litigation History

### A.      Pre-Complaint Investigation

In 2008, Class Counsel and Plaintiff Local 572 and Painters (and other third party payers

that were thereafter dismissed from the litigation) ("Original Plaintiffs") investigated whether

Valeant and co-Defendant GlaxoSmithKline's patent litigation and settlement strategy

concerning the drug Wellbutrin XL violated state unfair trade practices acts.  Class Counsel did

intense legal and factual research into the patents, patent litigations, citizen petitions, and

settlement agreements.

After this significant pre-complaint investigation, Original Plaintiffs filed a class action

complaint in this Court against Valeant and GSK on May 23, 2008.  (Dkt. No. 1).  The case was

first assigned to Honorable Bruce W. Kauffman, but was reassigned to Your Honor on

Defendants' motion.  (Dkt. No. 33).  Under Judge Kauffman's Case Management Order, all so-

called "End Payor" cases were coordinated into one Amended Complaint, filed July 10, 2008.

(Dkt. No. 23).

### B.      Rule 12 Motion Practice & Amended Complaints

On September 10, 2008, Defendants sought dismissal of the Amended Complaint under

FED. R. CIV. P. 12(b)(6).  Plaintiffs responded with an extensive memorandum of law in

opposition, together with appendices.  (Dkt. Nos. 52 & 53).  Defendants filed their reply briefs

on December 17, 2008.  The Court held oral argument on February 26, 2009.  Defendant GSK

filed a post-argument supplemental memorandum, and Plaintiffs responded to the arguments

made therein.

On March 26, 2009, Plaintiffs filed a First Amended Class Action Complaint ("FACAC")

that superseded the Amended Complaint and mooted the motions to dismiss.  (Dkt. Nos. 70 &

72).  On April 30, 2009, Defendants refiled two motions to dismiss this Complaint.  (Dkt. Nos.

77 & 78).  Plaintiffs opposed these motions on May 15, 2009.  (Dkt. No. 81).  Defendants filed

replies on May 29, 2009.  (Dkt. Nos. 85 & 86).  On June 15, 2009, Plaintiffs moved for

permission to file a sur-reply brief (Dkt. No. 87), which the Court granted on June 24, 2009.

Valeant filed opposition to Plaintiffs' sur-reply brief.  (Dkt. No. 89).

On July 31, 2009, the Court issued a Memorandum Opinion granting-in-part and

denying-in-part Defendants' motion to dismiss.  *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D.

143 (E.D. Pa. 2009).  The Court analyzed Defendants' arguments that Plaintiffs lacked Article III

and prudential standing to invoke the jurisdiction of the federal courts on their state law trade

practices acts class claims.  *Id.* at 151-58.  After determining that the question of the named

plaintiffs' standing should not await the class certification phase of the case, the Court concluded

that Plaintiffs had standing to assert claims under state laws where "the plaintiffs themselves are

located and the states where their members made purchases of Wellburtin XL."  *Id.* at 157.  The

Court went on to hold that Plaintiffs failed to allege standing under other state laws.  *Id.*

Substantively, the Court adjudged the legal viability of ten of Plaintiffs' state law statutory

claims and their common law claim of unjust enrichment.  *Id.* at 158-167.

On May 13, 2010, Aetna's parent company, Aetna, Inc., moved to intervene as a class

representative, seeking to add additional state claims on grounds that it purchased extended

release buproprion hydrochloride in those states. (Dkt. No. 149).  After briefing and a telephonic

argument, the Court denied that intervention motion on July 21, 2010, *In re Wellbutrin XL*

*Antitrust Litig.*, 268 F.R.D. 539 (E.D. Pa. 2010), but thereafter granted Aetna's motion for leave

to be added  as a class representative for claims then-pending under state law. (Dkt. No. 200).

Plaintiffs then moved to amend their FACAC to add claims under New York's Donnelly

Act and Illinois' Antitrust Act ("IAA"). (Dkt. No. 196).  The Court granted the motion as to the

Donnelly Act, but denied it as to the IAA. (Dkt. No. 242). *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670 (E.D. Pa. 2010).  This decision was among the first by the federal courts to apply the holding of *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) to class actions brought under these antitrust laws.

On January 7, 2011, Plaintiffs filed their Second Amended Consolidated Class Action Complaint ("SACAC") (Dkt. No. 249), adding claims under the Donnelly Act while conforming their class definition to the new allegations.

### C.     Discovery Efforts

Class Counsel made significant efforts to press for needed discovery.  They prosecuted and defended at least nine discovery motions (Dkt. Nos. 127, 128, 184, 185, 245, 253, 255, 333, 342).  All discovery was complete and the record synthesized by Class Counsel prior to settlement.  In all, Class Counsel reviewed more than 300,000 documents and took or defended more than 50 depositions of fact and expert witnesses.

### D.     Class Certification Proceedings

Class Counsel moved for class certification on December 14, 2009.  (Dkt. No. 109). Defendants filed an extensive opposition to this motion on January 31, 2011.  (Dkt. No. 268). Depositions of the parties' competing expert economists followed.  On April 29, 2011, the Court heard live testimony from Dr. Meredith Rosenthal and Dr. Andrew Joskow concerning the class certification issues.  Further briefing followed the hearing (Dkt. No. 323, 324) on May 20, 2011 (Dkt Nos. 323, 324) and on June 13, 2011 (Dkt. Nos. 330, 331).  The Court heard argument on the motion on May 27, 2011 (Dkt. No. 316).

On August 15, 2011, the Court granted-in-part and denied-in-part Plaintiffs' class certification motion. (Dkt. No. 354).  *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126 (E.D. Pa. 2011).  In doing so, it resolved a multitude of issues, including choice of law questions,

fixing the locus of antitrust impact of pharmaceutical retail purchases, and determined the evidentiary viability of Plaintiffs' econometric models for demonstrating injury and damages on a class-wide basis. *Id.*

Defendants moved to reconsider the class certification decision (Dkt. No. 356), which the Court denied on April 9, 2012. Defendants thereafter unsuccessfully sought permission to appeal the decision to the Third Circuit.

### E.      Summary Judgment Proceedings

On December 23, 2011, Defendants moved for summary judgment on all claims. (Dkt. Nos. 378, 379). The parties extensively briefed and presented the evidence they had amassed (Plaintiffs offered 768 exhibits) in support of, and in opposition to, the summary judgment motion. On March 20, 2012, the Court heard argument on the motion. Plaintiffs filed post-hearing briefs on April 30, 2012 and May 16, 2012 (Dkt. Nos. 414, 415, 422). On May 11, 2012, the Court granted the motions in part (as to the four patent lawsuits and the citizen petition), and deferred decision in part until a future date (as to the settlement agreements). (Dkt. No. 420). *In re Wellbutrin XL Antitrust Litig.*, 08-cv-2431, 2012 WL 1657734 (E.D. Pa. May 11, 2012).

The Court thereafter stayed the majority of further proceedings pending the Supreme Court's determination of the issues presented to it in *FTC v. Watson*, No. 12-416 (S. Ct.) another Hatch-Waxman generic delay case that may shape the Court's analysis of Plaintiffs' remaining claims. (Dkt. No. 445).[4]

---

[4] Class Counsel Lowey Dannenberg represented *Amicus Curiae* American Health Insurance Plans, the national association representing the health insurance industry, in these Supreme Court proceedings by filing a brief in support of the Federal Trade Commission.

F.      **Settlement Negotiations, Preliminary Approval Efforts**

Plaintiffs and Valeant began discussing settlement immediately following the Court's

May 11, 2012 decision on summary judgment.  The nature of those negotiations was described in

the Declaration of Kenneth Wexler, filed in connection with the motion for preliminary approval.

Dkt. No. 454-1. Plaintiffs and the Class filed their motion for preliminary approval on February

15, 2013 (Dkt. No. 453), and the Court granted the motion on February 22, 2013 (Dkt. No.456).

G.      **Notice and Administration.**

Following preliminary approval, notice of the class settlement was disseminated through

direct mail to those third party payers for whom the notice administrator had names and

addresses and through publication in media directed to reach the members of the Class.  Since

notice was published and mailed, several class members contacted the Settlement Administrator

with questions they had concerning the claims process.  Declaration of Class Action Settlement

Services, Inc. In Support of Final Approval ("Sears Decl."), Exh. E to *Second St. Phillip Decl.*, ¶

2.  Many of these class members had questions including those ranging from the necessity to file

supporting documentation to how the claims administrator would treat certain individual

circumstances.  *Id.*  The Settlement Administrator answered these questions to the satisfaction of

nearly all of the class members who called.  *Id.*  To date, the Settlement Administrator has

received 56 claims and no opt-outs or objections (the deadline for each is May 31, 2013).  *Id.*

## ARGUMENT

I.      **CLASS COUNSEL'S FEE REQUEST OF 33.33% OF THE SETTLEMENT FUND
        ($3,916,725) IS REASONABLE UNDER THE *GUNTER/PRUDENTIAL* FACTORS.**

A.      **General Principles**

Class action fee awards involve application of complicated principles, many of which are

in tension with one another.  A proper exercise of the Court's discretion to award a "reasonable"

fee involves a careful analysis of several factors in light of the unique experiences of each case. Some class actions involve rote legal issues, are not litigated vigorously, and are settled early and easily. District courts correctly scrutinize these awards carefully to ensure that class counsel is not overcompensated by the scale that the class mechanism brings to litigation. On the other side of the ledger, though, class counsel who bring difficult claims, zealously and vigorously advocate for their clients in the face of real risks of non-recovery must be rewarded for their efforts. Public policy just as forcefully supports generous fee awards for deserving class counsel as it demands parsimony where class counsel's efforts do not justify outsized fees.

As the Court is aware, and as we demonstrate below, Class Counsel worked extremely hard for many years on complex and novel legal issues in the face of real risks of non-payment to achieve a significant recovery from Valeant. Based on an application of the *Gunter/Prudential* factors, and the unique difficulties presented by this case, the Court should award the requested fees.

### B.   Standards Governing Class Counsel's Fee Application

Under the "common benefit doctrine" a prevailing party may obtain reimbursement of attorneys' fees in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class and where it is possible to spread the costs proportionately among the members of the class. *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) ("Th[e common fund] doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled recover from the fund the costs of his litigation, including attorneys' fees") (citations omitted). "The common fund doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Courts have broad discretion to determine what constitutes a reasonable award for attorneys' fees. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004). In addition to any other useful or relevant factors unique to the litigation, Courts analyze ten factors to assess a common benefit fee request: (1) the size of the fund and the number of beneficiaries; (2) objections to either the settlement fund or fee request; (3) the skill and efficiency of the lawyers; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time counsel devoted to the case; (7) awards in similar cases; (8) the value of class counsel's efforts to achieving the recovery as distinguished from other sources (*i.e.*, pressure brought to bear by government investigation); (9) the percentage fee that would have been negotiated had the private attorneys' services market dictated the result at the onset of the litigation; and (10) any innovative settlement terms. *Diet Drugs*, 582 F.3d at 541 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000); *In re Prudential Ins. Co.*, 148 F.3d 283, 333 (3d. Cir.1998). While the Court's analysis of these factors should be "robust." *id.*, they "need not be applied in any formulative way … and in certain cases, one factor may outweigh the rest. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 280 (3d Cir. 2009) (citing *Gunter*, 223 F.3d at 190).

In establishing attorneys' fees in class actions, courts in this Circuit generally award fees based upon a percentage of the common fund while analyzing counsel's reasonable time charges, or "lodestar" as a reasonableness "cross-check." *Diet Drugs*, 582 F. 3d at 540 (percentage-of-recovery method is "generally favored" (citing, *inter alia*, THE MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2004) (reporting that "the vast majority of courts of appeals now permit or direct district courts to use the percentage method in common-fund cases")). The Third Circuit has held that the "lodestar cross-check, while generally useful, should not displace

a district court's primary reliance on the percentage-of-recovery method." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006) (citation omitted).

### C.    Application of the *Gunter/Prudential* Factors

#### 1.    The Complexity and Duration of the Litigation

The complexity and duration of the litigation "is the first factor that a district court and should consider in awarding fees." *Gunter*, 223 F.3d at 197. "Antitrust class actions are perhaps the most complex cases to litigate." *Bradburn Parent Teacher Store v. 3M*, 513 F. Supp. 2d 322, 338-39 (E.D. Pa. 2007). This is especially so given the high standards of proof required for objective baselessness claims set for petitioning activity by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) and the additional complexities of prosecuting such claims under a host of state "*Illinois Brick* repealer" laws.

A welter of complex issues challenged the parties and the Court during this very protracted litigation. These included Class Counsel's work:

- arguing issues of Article III standing to bring claims under state law;
- seeking intervention by of one of the largest payers for Wellbutrin XL in the United States;
- applying intervening Supreme Court precedent to revive their New York antitrust claims;
- analyzing the regulatory and legal framework of the Hatch-Waxman Act and patent and antitrust law related to specific claims and defenses here;
- reviewing and analyzing the prosecution histories and strengths and weaknesses of the relevant patents held by Defendants and the inequitable conduct and fraud claims associated with them;
- presenting thorough economic evidence in support of class certification with a preeminent expert economist;
- working extensively with numerous experts to prepare reports addressing patent, damages, antitrust and regulatory issues;
- successfully certifying a class of end payors in six states, including TPPs and certain consumers;
- fending off choice-of-law hurdles introduced by the "indirect purchaser rule" of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); and

11

- amassing and synthesizing voluminous summary judgment evidence and presenting detailed, well-founded arguments on a multitude of complex arguments.

Plaintiffs endured more than four years of litigation of these and other difficult issues before settling their claims with Valeant.  Plaintiffs amply meet the first, and most significant, *Gunter* factor.

### 2.    The Size of the Fund and the Number of Beneficiaries.

Exclusive of the agreed costs of notice to be borne by Valeant, the settlement provides $11,750,000 in cash, exchanged for release of class member claims under six states' laws. Although the number of beneficiaries cannot be ascertained with certainty, it is estimated that there are approximately 34,000 third party payer members of the Class and many more consumer members of the Class.  *See* Declaration of Christopher Walsh ¶9, Ex. D to the *Second St. Phillip Decl.* The courts generally review this factor to assess whether a sizeable fund would result in an outsized fee based on a percentage of recovery.  *See, e.g., In re: Rite Aid Secs. Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005).  In "mega-fund" cases (generally those exceeding $100 million), percentages are at times scaled downward to avoid windfalls.  *Id.* (citing *In re: Cendant Corp. Litig.*, 264 F.3d 201, 284 (3d Cir. 2001)).

The fund achieved here does not qualify as a "mega-fund."  While the monetary benefits are admittedly modest in comparison to the damages estimated by Plaintiffs' expert at the class action stage,[5] counsel was able to obtain this sum only at a time during the litigation where summary judgment had been granted on a significant portion of their claims and the status of the proper treatment of antitrust claims involving allegedly unlawful agreements (the only remaining

---

[5]  Dr. Rosenthal estimated total class damages for both dosages for full period of generic foreclosure (including the nearly two-year period that preceded the settlement agreement) at $337.4 million.  *See* December 22, 2010 Rosenthal Report. at 5, submitted with Plaintiffs' March 11, 2013 Reply Brief in Support of Class Certification (Dkt. No. 287).

claims) was (and continues to be) uncertain.  The size of the fund and the number of

beneficiaries favors awarding Class Counsel a 33.33% fee.

### 3.      Objections to Either the Settlement Fund or Fee Request

This brief is filed before the May 31, 2013 deadline to object to either the Settlement

Fund or Fee Request will be due.  *Preliminary Approval Order* ¶ 15 (Dkt. No. 456).  Class

Counsel asked the Court to stage the settlement proceedings this way to protect against a

potential costly and prolonged attack based on the Ninth Circuit's interpretation of FED. R. CIV.

P. 23(h) in *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 995 (9th Cir. 2010); *but

see Cassese v. Williams*, Nos. 11-cv-4333, 2012 WL 5861804, at *2 (2d Cir. Nov. 20, 2012)

(rejecting *Mercury Interactive* attack on settlement notice), *cert. denied sub nom. Komar v.

Cassese*, No. 12-1031, 2013 WL 655187 (Apr. 29, 2013).

To date, there have been no objections to the Settlement.  The lack of objections (so far)

supports the Settlement, although because objections are routinely filed at or on the due date, full

weight cannot be given to these early results.  Should timely objections be filed, Class Counsel

will update the Court on the nature of the objections and their bearing on this factor.

### 4.      The Skill and Efficiency of the Lawyers

Class Counsel performed its function efficiently and skillfully at each turn.

Their litigation skill was manifested through navigating multiple complex issues, as discussed

above in outlining the complexity and duration of the litigation.  This Court previously

recognized Class Counsel's skill and experience in this specific type of litigation in certifying the

Class.  *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 138 (citing the "extensive experience"

of Class Counsel in this arena and their "vigorous[] and capable[] prosecution of the case).

### 5.      The Risk of the Litigation

This case starkly exemplifies risk in class action litigation.  After years of diligent work, the Court granted summary judgment in favor of defendants as to all of their sham petitioning claims on May 11, 2012.  By that time, many years of work and money had been spent prosecuting these claims.  The risk was real, palpable, and partially realized.  This factor strongly supports Class Counsel's fee application.

### 6.      The Amount of Time Counsel Devoted to the Case

Class Counsel's collective lodestar from the inception of the case through April 2013 totals $14,883,615.50.  Class Counsel has compiled all detailed time records from all attorneys of record, and will provide those to the Court for *in camera* review upon request.  This factor also strongly supports Class Counsel's fee request.

### 7.      Awards in Similar Cases

The most directly analogous case to use in comparing Class Counsel's fee request to other judicial determinations is the fee awarded by this Court in the Direct Purchaser litigation. There, this Court awarded a 30% fee against a $37.5 million settlement fund.  While many of the risks and complexities attending that case were shared by Indirect Purchasers, the Direct Purchaser Plaintiffs did not face Article III standing challenges, arguments relating to the various state statutes at play, *Shady Grove* arguments concerning the interplay between state procedural laws limiting class certification and Rule 23, and many arguments raised on class certification concerning the damage model Plaintiffs employed, state-specific questions, complex predominance arguments, and related issues.  Hence, in comparison to the Direct Purchaser percentage fee of 30%, the Indirect Purchaser percentage fee of 33.33% is reasonable given the additional risks associated with indirect purchaser litigation.

"A study referenced by another court in this district analyzed 289 class action settlements ranging from under $1 million to $50 million and determined that the average attorney's fees percentage to be 31.7% and the median to be one-third."  *Boone*, 668 F. Supp. 2d at 714 (citing *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (Dalzell, J.)); *See also Rite Aid*, 396 F.3d at 303; *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000) (Brody, J.) (noting that an "award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district"); 4 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 14:6 (4th ed. 2006) ("In the normal range of common fund recoveries in . . . antitrust suits, common fee awards fall in the 20 to 33 per cent range.");

Class Counsel's requested fee is consistent with prior fee-setting practice in other similar class actions. The following table summarizes seventeen cases that support a one-third fee in such matters:

| Generic Suppression Antitrust Class Action Settlements One-Third Attorneys' Fees Awarded | | |
|---|---|---|
| Date | Case Name | Settlement Amount |
| 11-07-12 | *In re Wellbutrin XL Antitrust Litigation*, E.D. Pa. 08-2431. (Direct Purchasers) | $37.5 M |
| 05-31-12 | *Rochester Drug Co-Operative, Inc., v. Braintree Laboratories, Inc.*, D. Del. 07-142-SLR | $17.5 M |
| 01-12-12 | *In re Metoprolol Succinate Antitrust Litig.*, D. Del. 06-52-MPT | $20 M |
| 11-28-11 | *In re DDAVP Direct Purchaser Antitrust Litig.*, S.D.N.Y. 05-2237 | $20.2 M |
| 08-11-11 | *Meijer, Inc. v. Abbott Labs.*, N.D. Cal. 07-05985-CW | $52 M |
| 01-31-11 | *In re Nifedipine Antitrust Litig.*, D.D.C. 03-mc-223-RJL | $35 M |
| 01-25-11 | *In re Oxycontin Antitrust Litig.*, S.D.N.Y. 04-md-1603 SHS | $16 M |
| 10-28-09 | *In re Tricor Indirect Purchaser Litig.*, D. Del. 05-360 (SLR) | $67.5 M |

15

| 04-23-09 | *In re Tricor Direct Purchaser Litig.*, D. Del. 05-340-SLR | $250 M |
| 04-20-09 | *Meijer, Inc. v. Barr Pharms., Inc.*, D.D.C. 05-2195 | $22 M |
| 11-09-05 | *In re Remeron Direct Purchaser Antitrust Litig.*, D.N.J. 03-0085 | $75 M |
| | *In re Relafen Antitrust Litig.*, D. Mass. 01-12239-WHY [Indirect Purchaser Settlement] | $67 M |
| 04-19-05 | *In re Terazosin Hydrochloride Antitrust Litig.*, S.D. Fla. 99-MDL-1317 | $74 M |
| 09-28-04 | *North Shore Hematology-Oncology Assoc., P.C. v. Bristol-Myers Squibb Co.*, D.D.C. 04-248-EGS | $50M |
| 04-09-04 | *In re Relafen Antitrust Litig.*, D. Mass. 01-12239-WHY [Direct Purchaser Settlement] | $175 M |
| 04-11-03 | *La. Wholesale Drug Co. v. Bristol-Myers Squibb Co.*, S.D.N.Y.01-MD-1410-JGK | $220 M |

Significantly, most of the cases referenced herein involved  releases given by all class members for claims in 50 states (direct purchaser actions) or claims in the approximately 25 "*Illinois Brick* repealer" states.  Here, by contrast, the Settlement only provides for releases given by absent class members for the six states that were the subject of the Court's class certification decision, *Settlement Agreement* at ¶18(B).  This Settlement is, therefore, more valuable to the Class than traditional generic suppression cases.

The requested fee award is in line with both the fee awarded by this Court in the Direct Purchaser action and the fees awarded in a host of generic suppressions indirect and direct plaintiff antitrust actions over the last several years.  This factor, therefore, supports Plaintiffs' requested fee award.

### 8. The Value of Class Counsel's Efforts In Achieving The Result As Distinguished From Other Sources

This case was not preceded by a government investigation or another source that can take credit for achieving the Plaintiffs' success.  Plaintiffs developed the legal theories and record in

connection with the Direct Purchaser Plaintiffs who were litigating their companion case alongside of Plaintiffs.  This factor, therefore, is not relevant to the Court's analysis.

>   **9.    The Percentage Fee That Would Have Been Negotiated Had The Private Market Set The Rate At the Outset of the Litigation**

A one-third contingency fee is common in individual litigation, and a higher fee is often negotiated in antitrust cases given the complexities and risks.  *See Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 340 (a 35% fee award was comparable to the percentage counsel would have negotiated had the case been subject to a private contingency fee agreement); *In re: Remeron Antitrust Litig.*, No. 03-085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("[a]ttorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation"); *see also In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, at 194 (E.D.Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *In re Orthopedic Bone Screws Prod. Liab. Litig.*,MDL No. 1014, 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) ("the court notes that plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery…"); *Durant v. Traditional Investments, Ltd.,* No. 88 Civ. 9048, 1992 WL 203870, at *4 n.7 (S.D.N.Y. Aug. 12, 1992) ("contingent fee agreements up to 40 percent have been held reasonable"); *Phemister v. Harcourt Brace Janovich, Inc.,* No. 77 C 39,1984 WL 21981, at *15 (N.D. Ill. Sept. 14, 1984) ("[t]he percentages agreed on [in contingent fee arrangements in non-class action damage lawsuits] vary, with one-third being particularly common").

This factor also supports Class Counsel's fee request.

**10.      Innovative Settlement Terms**

The Settlement contains an innovative notice cost sharing term.  Class Counsel negotiated that Valeant would contribute 50% of the costs of providing the class members with notice of the settlement, up to a maximum of $500,000.00.  *Settlement Agreement* ¶ 13.  These sums are payable regardless of whether this Court concludes that the Settlement will not be approved.  *Id.*  Given that Plaintiffs are ordinarily responsible to pay for the costs of notice, *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) ("plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit"), this added financial benefit provided the class members with a non-refundable cost-sharing option for the notice program.  In this way, Class Counsel achieved an innovative solution to the problem of having the Class bear the full risk for the costs of receiving notice.  This aspect of the settlement added real value and favors approval of Class Counsel's fee application.

**11.      A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request**

A lodestar cross-check ensures that application of the percentage method results in a recovery that is "sensible." *Rite Aid*, 396 F.3d at 305-06; *see also In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 263 (D. Del. 2002)* ("The Third Circuit suggests that the district court cross-check the percentage award against the 'lodestar' award to help ensure the reasonableness of the fee.").  Once the lodestar is calculated, "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases." Manual for Complex Litigation (Fourth) § 14.122.

When attorneys' fees are awarded, the current market rate, not the rate at the time the services were performed, is to be used. *Lanni v. State of New Jersey*, 259 F.3d 146 (3d Cir.

2001) ("The current rate in 2008, rather than the historic rates of 2005, 2006 and 2007, must be used in the Third Circuit to reflect the delay in payment for services rendered in past years, measured by current market rates.").[6]  In comparable cases, courts in the Third Circuit have often been presented with, and approved, lodestar multipliers in the 2-4 range, but accepted multipliers have been much higher.[7]

Class Counsel's lodestar is $14,883,615.50.  The requested 33.33% of the Gross Settlement Fund ($3,916,275) is substantially less than the lodestar, and thus has a multiplier of .26.  The lodestar cross-check confirms the reasonableness of the fee request.

## III.   THE COURT SHOULD AWARD CLASS COUNSEL THEIR EXPENSE REIMBURSMENTS

Courts routinely award reimbursement of similar expenses from common fund settlements. *See e.g., In re Cendent Corp.*, 832 F. Supp. 2d 327, 343 (D.N.J. 2002); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995); *Oh v. AT&T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004).

Class Counsel spent $1,279,514.86 in out-of-pocket expenses during the course of litigating this case.  *See* Declaration of Kenneth A. Wexler, Ex. U to *Second St. Phillip Decl.* These expenses were reasonably incurred in connection with prosecuting the claims of the

---

[6] *Accord Phillips v. Phila. Hous. Auth.*, No. 00-4275, 2005 U.S. Dist. LEXIS 34606, at *18-20 (E.D. Pa. Dec. 20, 2005). *See also Rode v. Dellarciprete*, 892 F.2d 1177, 1184 (3d Cir. 1990) ("the district court can make 'an appropriate adjustment for delay in payment – whether by application of current rather than historic hourly rates or otherwise.'") (quoting *Missouri v. Jenkins*, 491 U.S. 274 (1989)).

[7] *See, e.g., Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718 (E.D. Pa Aug. 14, 2006), at *24 (approving a percentage fee award that translated to a 4.77 multiplier in case that settled after one year); (approving one-third fee where lodestar multiplier was 3.93); *Warfarin*, 212 F.R.D. at 263 (approving lodestar cross-check finding a 1.33 multiplier calculated at counsel's then-current rates); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.*, 04-mc-00535-ESH; (D.D.C. Apr. 24, 2006) (multiplier of 2.33); *Remeron*, Civ. 2005 U.S. Dist. LEXIS 27013, at *47-48, (multiplier of 1.86 is on the "low end of the spectrum"). *See also Segen v. OptionsXpress Holdings Inc.*, 631 F. Supp. 2d 645 (D. Del. 2009) (approving a fee award resulting in a lodestar multiplier of 2.06 in securities class action).

Plaintiffs and the Class.  A vast majority of these funds were spent on expert witnesses for class

certification and summary judgment (including pharmaceutical sciences experts, economists, and

regulatory experts), and the document management platform used to host, review, and code

documents.  *Id.* Other expenses include legal research fees, filing fees, court reporters, travel for

court hearings and depositions, copying fees, and other necessary expenses incident to

prosecuting this litigation.  *Id.*  These expenses were necessarily incurred in prosecuting and

settling the litigation with no guarantee of recovery, and were thus conservatively and cautiously

spent.  Accordingly, Class Counsel requests that these expenses be reimbursed.

## IV.   THE COURT SHOULD AWARD $60,000 TO THE CLASS REPRESENTATIVES

"Like the attorneys in this case, the class representatives have conferred benefits on all

other class members and they deserve to be compensated accordingly."  *In re Linerboard*

*Antitrust Litig.,* MDL No. 1261, 2004 WL 1221350, at *18 (E.D.Pa. 2004)(citation omitted).   As

many courts recognize, these efforts on behalf of the class should be compensated.  *See e.g., In*

*re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 400 (D.D.C. 2002) ("Incentive

awards are not uncommon in class action litigation.... [c]ourts routinely approve incentive

awards to compensate named plaintiffs for the services they provided and the risks they incurred

during the course of the class action litigation.") (internal quotations and citation omitted).

Here, the Class Representatives spent their own time and expense litigating these cases

for the benefit of the absent members of the settlement class, including sitting for depositions,

producing data and monitoring the progress of the litigation.  *See Second St. Phillip Decl.* Exs. F-

H.   Class representatives were required by Valeant to provide greater consideration for the

settlement than absent class members because each was required to release all claims it hold, not

just claims under the laws of the six class states.  *See* Settlement Agreement, ¶18(A).  For

example, Aetna, whose parent and sister companies (whose claims are also encompassed within the release given) is one of the largest health insurers nationwide, with sizeable purchases of Wellbutrin XL and generic bupropion in every "*Illinois Brick* repealer" state, gave a release of its claims arising under those state laws, unlike class members.  This broader release from a major party that had demonstrated a willingness to litigate to recover for such claims was a significant point of negotiation in the class settlement.  Local 572 and Painters gave releases of the same scope.

All Plaintiffs made substantial contributions to the prosecution of this case.  Local 572 and Painters have been involved since the very beginning, and expended considerable time and effort on discovery, strategy, and otherwise advancing the claims on behalf of the Class.  *See Second St. Phillip Decl.* Exs. F-H.  In early 2010, when Aetna learned that the original class plaintiffs in had uncertainty regarding their jurisdictional standing, Aetna began an evaluation whether it needed to involved itself in the litigation to preserve the claims for itself and the others.  *Second St. Phillip Decl.*, Ex. F, at ¶4.  When the Court granted Aetna Health of California Inc.'s motion to substitute as a class representative for claims then-pending under state law, (Dkt. No. 200), Aetna then committed substantial efforts of multiple employees to assist in the prosecution of this litigation.  Class Counsel met with Aetna's internal counsel, Eric Myers, and business people on numerous occasions and participated in countless telephone calls with representatives of Aetna to discuss litigation strategy and discovery.  *Id.* at 8.  Aetna committed several employees to review and produce a large volume of purchasing data and other information responsive to defendants' discovery requests, *id.* at ¶6, including competitively sensitive data, requiring cooperation from Aetna's internal counsel and Aetna personnel.  *Id.* Production of this discovery entailed competitive risk for Aetna, as pharmacy management

practices were disclosed to defendants, who are major vendors of Aetna. Previously, Aetna served as a class representative in another class action lawsuit regarding prescription drugs. *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508 (E.D. Mich. 2003). In *Cardizem CD*, the Court conferred a $75,000 incentive fee award to Aetna after it performed similar activities as a class representative. *Id.* at 535.

Class Counsel notified the Class that they intend to seek a total of $60,000 in incentive awards for the Class Representatives. The amounts requested are similar to amounts awarded in similar settlements. *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, *18 (E.D.Pa.2004) (approving $25,000 to each representative of the classes). *See also In re Remeron End-Payor Antitrust Litig.*, 02-cv-2007 FSH, 2005 WL 2230314, at *18 (D.N.J. Sept. 13, 2005) (awarding $75,000 to the five class representatives).

## CONCLUSION

For the stated reasons, the Class Representatives and Class Counsel respectfully request that the Court grant their request for an award of incentive fees totaling $60,000 to Class Representatives. Class Counsel also respectfully request that the Court award it fees in the amount of $3,916,275 and costs in the amount of $1,279,514.86 payable from the Gross Settlement Fund.

Dated: May 15, 2013                                    Respectfully submitted,

                                    By:  /s/  Kenneth A. Wexler.
                                         Kenneth A. Wexler
                                         Thomas A. Doyle
                                         Amber M. Nesbitt
                                         Justin N. Boley
                                         Wexler Wallace LLP
                                         55 W. Monroe Street, Suite 3300
                                         Chicago, IL  60603
                                         Tel:  (312) 346-2222
                                         Fax:  (312) 346-0022

By:  /s/  Peter St. Phillip, Jr.
     Richard W. Cohen
     Peter D. St. Phillip, Jr.
     Gerald Lawrence
     Uriel Rabinovitz
     Lowey Dannenberg Cohen & Hart, P.C.
     One North Broadway
     White Plains, NY  10601-2310
     Tel:    (914) 997-0500
     Fax:    (914) 997-0035

By:  /s/  James G. Stranch, III
     James G. Stranch, III
     R. Jan Jennings
     J. Gerard Stranch, IV
     Joe P. Leniski, Jr.
     Branstetter Stranch & Jennings PLLC
     227 Second Avenue North, 4th Floor
     Nashville, TN  37201-1631
     Telephone:  (615) 254-8801
     Facsimile:  (615) 255-5419

     ***Plaintiffs' Co-Lead Class Counsel***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 15, 2013, I electronically filed the foregoing using the Court's Case Management and Electronic Case Filing system, which will send notification of such filing to counsel of record in this action registered with the Court's system.  Those counsel not registered with the Court's system will receive service via electronic and U.S. Mail.

/s/ Amber M. Nesbitt