# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re WELLBUTRIN XL ANTITRUST LITIGATION | Case No. 2:08-cv-2433 |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS | **Hon. Mary A. McLaughlin** |

## DEFENDANTS SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE AND GLAXOSMITHKLINE PLC'S RESPONSE IN OPPOSITION TO THE INDIRECT PURCHASER PLAINTIFF CLASS'S MOTION TO COMPEL DEPOSITION TESTIMONY OF GSK

Dated:  December 5, 2014

Leslie E. John (I.D. No. 62290)
john@ballardspahr.com
Edward D. Rogers (I.D. No. 69337)
rogerse@ballardspahr.com
Stephen J. Kastenberg (I.D. No. 70919)
kastenberg@ballardspahr.com
Jason A. Leckerman (I.D. No. 87915)
leckermanj@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

Attorneys for Defendants
SmithKline Beecham Corporation
d/b/a GlaxoSmithKline and
GlaxoSmithKline plc

GlaxoSmithKline plc and SmithKline Beecham Corporation d/b/a
GlaxoSmithKline ("GSK") respectfully submit the following Response in Opposition to the
Indirect Purchaser Plaintiff Class's Motion to Compel Deposition Testimony of GSK.

## I.      INTRODUCTION

Plaintiffs move to compel a GSK deposition that has no bearing on GSK's motion
to decertify the indirect purchaser class for failure to satisfy the Third Circuit's "ascertainability"
requirement.  To avoid decertification, plaintiffs must identify, through a "reliable and
administratively feasible method," the entities and individuals that bore the financial risk of
prescription drug purchases under the complex risk-sharing arrangements between pharmacy
benefit managers ("PBMs") and the other third-party payers ("TPPs").  The relevant information
concerning the PBM/TPP relationships is contained in documents, *i.e.*, contracts among those
entities and transaction data, in the possession of the PBMs and TPPs themselves.   Insofar as
plaintiffs have questions about the documents, they should direct them to the TPPs and PBMs,
not GSK, who is not a party to those relationships.  Plaintiffs recognize this, which explains why
they told the Court at the October 17, 2014 Conference that they needed discovery from PBMs
and TPPs but did not mention needing any discovery at all, let alone a Rule 30(b)(6) deposition,
from GSK.  In fact, plaintiffs recently issued subpoenas for documents and depositions to nine
different PBMs (which cover a total of over 200 million lives) regarding their purchases of
Wellbutrin XL and financial arrangements with members of plaintiffs' Class.

Plaintiffs now ask the Court to compel GSK to produce a Rule 30(b)(6) witness to
testify regarding GSK's supposed second-hand "knowledge" of these PBM/TPP arrangements.
The Court should deny the motion because GSK's knowledge of PBM/TPP relationships has no
relevance to the ascertainability inquiry.  That inquiry turns on the existence of records that can
be used to determine class membership, not what some representative of a company that did not

create the records and is not a party to the relationships at issue "knows" about those records. Notably, plaintiffs neither explain nor offer a single concrete example of what they might learn from a GSK deposition, *i.e.*, how GSK's "knowledge" would affect the plaintiffs' ability to establish a "reliable and administratively feasible" method of identifying class members.

The deposition topics identified by plaintiffs underscore the unsuitability of a GSK deposition here. For example, Topic No. 2 seeks testimony on "all documents reflecting the nature of any *PBM contracts with TPPs* during the Class Period." That is a document request, not a matter on which testimony from a third party unconnected to the documents is appropriate. And, GSK has already produced millions of pages of documents to the plaintiffs.

Given the demonstrable irrelevance of a GSK deposition, plaintiffs' motion to compel can only be viewed as the latest tactical gambit in a campaign to derail GSK's motion to decertify, which began with their unsuccessful motion to strike and continued with a proposed schedule that would have extended the decertification proceedings many months beyond what plaintiffs told the Court was necessary. The Court should deny the motion and direct the parties to complete the remaining fact discovery on schedule.

## II.    ARGUMENT

### A.    PBMs and TPPs, Not GSK Employees, Are the Proper Entities to Testify About the Private Financial Relationships Between PBMs and TPPs

The appropriate witnesses to testify regarding the relationship between PBMs and TPPs (*i.e.*, the members of plaintiffs' class) are obviously the PBMs and TPPs themselves, not GSK—a non-party to the complex PBM-TPP arrangements that allocate the financial risk for any given purchase of Wellbutrin XL. Indeed, plaintiffs have outstanding subpoenas to "nine (9)

of the largest PBMs" in the United States.[1]   Plaintiffs served that discovery knowing that PBMs

participate in over 70% of prescription drug transactions[2] and two of the PBMs subject to

plaintiffs' subpoena control 73% of the large-employer market and cover over 200 million lives.[3]

PBMs are more than "intermediaries"; by aggregating the bargaining power of their clients, the

PBMs negotiate significant volume discounts or rebates from manufacturers and pharmacies and

bear financial risks in order to profit from prescription drug transactions.

Plaintiffs' unexplained suggestion that GSK has "knowledge" of the financial

arrangements between PBMs and TPPs does not come close to justifying a GSK deposition.

GSK's knowledge of these arrangements has no bearing on whether plaintiffs have an

administratively feasible method for ascertaining the class, or whether, alternatively,

identification of class members would require mini-trials.  *See Carrera v. Bayer Corp.*, 727 F.3d

300, 307 (3d Cir. 2013); *Skelaxin*, 299 F.R.D. at 572.  Indeed, even though GSK has produced all

of the available data that plaintiffs requested, such data will not indicate who ultimately bore the

financial risk.  While the data shows, in some instances, how much was paid to the pharmacy, it

will not delineate the range of private financial relationships between PBMs and TPPs.  To the

extent that there is any information related to ascertainability, plaintiffs' subpoenas to the PBMs

are the proper vehicle, given that they seek *documents and deposition testimony* from the PBMs

---

[1]     *See* Plaintiffs' November 10, 2014 Letter to the Honorable Mary McLaughlin.

[2]     *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 566 (E.D. Tenn. 2014).

[3]     *See* Proposed Acquisition of Medco Health Solutions, Inc. by Express Scripts, Inc., FTC
File No. 111-0210, Dissenting Statement of Commissioner Julie Brill, located at
http://www.ftc.gov/sites/default/files/documents/closing_letters/proposed-acquisition-
medco-health-solutions-inc.express-scripts-inc./120402medcobrillstatement.pdf (last
accessed Dec. 4, 2014).

regarding a range of topics, including "the information maintained by you with respect to the adjudication of claims for Wellbutrin XL during the Class Period."[4]

### B.    Plaintiffs' Rule 30(b)(6) Deposition Topics Are Irrelevant and Many Have Been Satisfied Through Document Discovery

The deposition topics identified by plaintiffs underscore the lack of relevance or utility of a GSK deposition.

#### 1.    Topic No. 1: The use of Capitation Contracts by PBMs during the Class Period

A capitation contract is a contract between a PBM and TPP to which GSK is not a party.  Obviously, the "use by PBMs" of capitation contracts with their clients is within the first-hand knowledge of the PBMs and TPPs, which explains why plaintiffs are seeking documents and deposition testimony from PBMs on their "policies, procedures, or practices related to Capitation Contracts during the Class Period."[5]

In any event, this topic is irrelevant to GSK's motion to decertify.  GSK's expert, Dr. Bruce Strombom, agrees that "Capitation agreements are not commonly used by PBMs."[6] Rather, the focus of GSK's motion to decertify is what the Federal Trade Commission calls the "many moving parts" of PBM economics, which results in a situation where "each time a PBM enters into a contract to provide PBM services [with a TPP] for a term longer than its existing

---

[4]    *See* Notice of 30(b)(6) Subpoena *Duces Tecum and Testificandum* to Third Party Express Scripts, Inc., Req. No. 7.  A true and correct copy of the subpoena, which is representative of the other eight, is attached hereto as Exhibit A. ("Express Scripts Subpoena.")

[5]    *See, e.g.,* Ex. A, Express Scripts Subpoena, Req. No. 1; *id.* at Req. No. 2 (also seeking documents and testimony on "Capitation Contracts, to the extent they exist, between you and TPPs . . . during the Class Period.")

[6]    *See* Expert Report of Dr. Bruce Strombom, ¶ 17, attached as Exhibit A to GSK's Motion to Decertify (ECF No. 507).

contracts with its current inputs, PBMs bear some price risk."[7]  As plaintiffs stated during the

Conference before the Court and as their class certification expert testified, the class member is

the entity that bore the financial risk.  Thus, ascertainability hinges on whether there is an

administratively feasible method to determine who bore that risk.

### 2.    Topic No. 2: All documents reflecting the nature of any PBM contracts with TPPs during the Class Period

Similar to Topic No. 1, there is no reason to depose GSK regarding contracts to

which it is not a party.  Notably, despite the millions of pages produced by GSK in this litigation

that consist of memoranda, strategic plans, and emails, plaintiffs have not come forward with a

single document that proves that GSK employees have any unique knowledge regarding PBM-

TPP relationships.

Plaintiffs claim that because GSK tracks the placement of its drugs on

formularies (*i.e*., a listing of preferred and non-preferred prescription drugs that are covered

under a health care plan) of the TPP-clients of PBMs, GSK has "sufficient knowledge" of the

PBM-TPP contracts.  But tracking formulary placement does not provide information regarding

the confidential financial arrangements between a TPP and a PBM that go to the core issue here.

And once again, the requested information should be sought from those with first-hand

knowledge of those contracts—the members of plaintiffs' class, including the PBMs that

plaintiffs served with subpoenas.[8]

---

[7]     Federal Trade Commission, "Pharmacy Benefit Managers: Ownership of Mail Order Pharmacies," August 2005 (2005 WL 2234759).

[8]     Moreover, GSK has already produced documents in response to plaintiffs' broad requests for "[a]ll documents concerning the promotion and advertising of Wellbutrin XL, including . . . communications with pharmacy benefit managers, insurers, health plans, and third-party payors," (*see* Indirect Purchaser Plaintiffs' Requests for Production of Documents, ("IPP RFP") No. 58 (Sep. 10, 2009)), and "[a]ll documents related to

(continued...)

3.      **Topic No. 3: All rebate contracts you had or have with any third party with respect to Wellbutrin XL that were in effect during the Class Period**

GSK already produced at least *110 rebate contracts* with PBMs and TPPs, which GSK has listed for plaintiffs' convenience by Bates number in Exhibit B.  These contracts were included in the 3.1 million pages of documents and data produced by GSK in this litigation. Plaintiffs previously deposed multiple GSK witnesses regarding the "pricing of Wellbutrin XL . . . including . . . rebates," and "contracts for the sale of Wellbutrin XL." (*See* IPP Dep. Notice (Nov. 19, 2009).)   Indeed, plaintiffs deposed Jamey Millar (GSK's Vice President, Institutional Business and former Vice President, Strategic Pricing, Contracting and Managed Markets) about a wide range of topics pertaining to TPPs, such as GSK's understanding of TPP plan designs, GSK's discounting to TPPs, pricing studies for Wellbutrin XL, and GSK's reliance on IMS and Wolters Kluwer pharmaceutical data.  Plaintiffs fail to articulate how any additional deposition testimony from GSK about these subjects help them identify members of the class.

4.      **Topic No. 4: All documents related to [GSK's] marketing of Wellbutrin XL to TPPs and/or PBMs**

Plaintiffs offer no explanation regarding how testimony from a GSK employee about GSK's "marketing of Wellbutrin XL to TPPs and/or PBMs" will aid them in proving that a reliable, administratively feasible method exists for identifying members of their class (let alone how a witness could testify about "all documents" related to that topic).  That GSK marketed Wellbutrin XL to TPPs and PBMs does not establish which entity in the chain of payment bore the financial risk of the overcharge plaintiffs are purporting to prove.  And, GSK has already

---

(...continued)

      advertising, sales, or marketing materials for third-party payors or entities that paid or reimbursed for all or any portion of Wellbutrin XL bought at retail or mail order pharmacies," (*see* IPP RFP No. 64).

produced substantial documents concerning its marketing strategies in response to plaintiffs'

prior documents requests.[9]

> **5.     Topic No. 6: All data provided to [GSK] pursuant to any rebate contract referenced in Paragraphs 3 [and 5] above involving Wellbutrin XL**

GSK has already produced data regarding utilization of Wellbutrin XL by TPP

customers (*e.g*., PBMs, large insurers, self-funded groups) that have contracts with GSK entitling

them to rebates based on, among other things, the market share of drug utilization by their

members and enrollees.  In response to plaintiffs' recent document requests, GSK produced a

broader set of this data (*i.e*., the rebate data PBMs provided to GSK using NCPDP standard).

This type of data, which exists in an unwieldy spreadsheet with thousands of rows and hundreds

of columns, does not lend itself to deposition testimony.

---

[9]     GSK produced documents in response to requests for "[a]ll documents concerning the . . . marketing tactics and strategies for Wellbutrin XL, including (a) . . . sales and marketing meeting materials, presentations, and summaries," (*see* IPP RFP. No. 57 (Sep. 10, 2009)), "[a]ll documents concerning the promotion and advertising of Wellbutrin XL, including . . . communications with pharmacy benefit managers, insurers, health plans, and third-party payors," (*see* IPP RFP No. 58), and "[a]ll documents related to advertising, sales, or marketing materials for third-party payors or entities that paid or reimbursed for all or any portion of Wellbutrin XL bought at retail or mail order pharmacies," (*see* IPP RFP No. 64).

## III.    CONCLUSION

For the foregoing reasons, GSK respectfully requests that the Court deny the

Indirect Purchaser Class's Motion to Compel Deposition Testimony of GSK.

Respectfully submitted,

Dated:  December 5, 2014                         /s/ Leslie E. John
                                                Leslie E. John (I.D. No. 62290)
                                                john@ballardspahr.com
                                                Edward D. Rogers (I.D. No. 69337)
                                                rogerse@ballardspahr.com
                                                Stephen J. Kastenberg (I.D. No. 70919)
                                                kastenberg@ballardspahr.com
                                                Jason A. Leckerman (I.D. No. 87915)
                                                leckermanj@ballardspahr.com

                                                **BALLARD SPAHR LLP**
                                                1735 Market Street, 51st Floor
                                                Philadelphia, PA  19103
                                                Phone:  (215) 665-8500
                                                Facsimile: (215) 864-8999

                                                Attorneys for Defendants
                                                SmithKline Beecham Corporation
                                                d/b/a GlaxoSmithKline and
                                                GlaxoSmithKline plc